AKA/JAC:   USAO 2013R00402

ENTERED
LOGGED ——— RECEIVED

NOV 1 2 2014

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY
DEPUTY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| v. | * | **CRIMINAL NO.**  TDC 14cr529 |
| | * | |
| | * | **(Conspiracy to Interfere with Interstate** |
| **VADIM E. MIKERIN,** | * | **Commerce by Extortion, 18 U.S.C.** |
| | * | **§ 1951(a); Forfeiture, 18 U.S.C.** |
| **Defendant** | * | **§ 981(a)(1)(C), 28 U.S.C. § 2461(c))** |
| | * | |

*******

### INDICTMENT

### COUNT ONE
### (Conspiracy to Interfere with Interstate Commerce by Extortion)

The Grand Jury for the District of Maryland charges that:

### Introduction

At all times relevant to this Indictment:

1.     The United States Department of Energy ("DOE"), a department within the executive branch of the United States government, was the executive agent for an agreement, executed on or about August 31, 1992, between the United States and the Russian Federation (the "20-Year Agreement" or "HEU Agreement") which outlined operations for the systematic "downblending," or conversion, of highly-enriched uranium ("HEU") from Russian nuclear warheads into low-enriched uranium ("LEU") for civilian nuclear power generation.   The 20-Year Agreement further stipulated the transportation of this "converted" LEU from Russia to the United States for use in United States civilian nuclear reactors.   This initiative was given the name "Megatons to Megawatts" or "M2M" by DOE's National Nuclear Security Administration ("NNSA.")

2.      The Russian executive agent for the HEU Agreement was the Ministry for Atomic Energy ("MINATOM"), which in 2007 became the Russian State Atomic Energy Corporation ("ROSATOM"), a wholly Russian state-owned enterprise.

3.      The commercial agent for the United States was the United States Enrichment Corporation ("USEC"), based in Bethesda, Maryland.

4.      The Russian commercial agent was JSC Techsnabexport ("TENEX"), a subsidiary of ROSATOM.

5.      On or about January 14, 2014, USEC and TENEX executed a contract ("the Agreement"), which provided that the HEU would be converted to LEU in Russian nuclear facilities, and then sold to USEC for transport to the United States.   The first shipment of LEU occurred in May 1995.   Through 2013, a total of 475 metric tons of Russian warhead grade HEU, equivalent to 19,000 nuclear warheads, was converted in Russia to LEU and sold in the United States for use as fuel.   As much as ten percent of electricity produced in the United States was generated from fuel obtained through the Agreement.   The final shipment of LEU from Russia under the Agreement was in December 2013.

6.      TENEX and USEC maintained an additional contract, the Return Feed Program, executed in 2001, wherein USEC shipped spent LEU back to Russia for re-enrichment.

7.      In or about 2010, TENEX opened TENAM, a fully-owned subsidiary, which was located in Bethesda, Maryland.   TENAM served as TENEX's official representative office in the United States, and directly contracted with companies in the United States nuclear power industry for the shipment of the LEU to power plants in the United States.   As such, TENAM and TENEX conducted business in and affecting interstate and international commerce in that the contracts involved the shipment of LEU from Russia to, by, and through vendors in the United States.

2

8.    Defendant **VADIM E. MIKERIN ("MIKERIN")** was a citizen of the Russian Federation, working in Maryland on a L1 Visa issued by the United States.

9.    Beginning in or about 2001, **MIKERIN** was the Pan-American Director for TENEX, overseeing TENEX's operations under the Agreement in the United States.

10.    Beginning in or about 2010, **MIKERIN** became the executive director of TENAM. Among his duties, **MIKERIN** was responsible for managing the contracting activities between United States based companies and TENEX, and facilitated the contractual negotiations between the entities, and thereby engaged in interstate and foreign commerce.

11.    Coconspirator One was a United States citizen and associate of MIKERIN's who worked in the nuclear fuel transportation industry.

12.    Corporation A was a "shell" corporation with a physical address in the United Kingdom.  Corporation A principally banked with a financial institution, Aizkraukles Banka, in Latvia, and was principally owned and controlled by a Russian national, Coconspirator Two.

13.    Corporation B was a "shell" company with a physical address in the Republic of Seychelles.  Corporation B principally banked with a financial institution, Alfa Bank, in Cyprus, and was principally owned and controlled by a Russian national, Coconspirator Three.

14.    Corporation C was a "shell" company with a physical address in Switzerland. Corporation C principally banked with a financial institution, Hyposwiss Private Bank Limited, in Switzerland.

15.    Victim One was a Florida-based lobbyist and consultant that had active business dealings with TENEX from 2010 through 2012.

3

### The Conspiracy to Commit Extortion

16.     Between in or about 2009 through at least in or about January 2012, in the District of Maryland and elsewhere, the defendant,

### VADIM E. MIKERIN,

did knowingly and willfully combine, conspire, confederate, and agree with other persons, known and unknown to the Grand Jury, to obstruct, delay, and affect commerce and the movement of an article and commodity in commerce by extortion, as that term is defined in Title 18, United States Code, Section 1951(b)(1), by the unlawful taking of money and other things of value from Victim One with Victim One's consent induced by the wrongful use of force, violence, and fear, including the fear of economic loss, involving commercial businesses that were engaged in interstate and foreign commerce, in violation of Title 18, United States Code, Section 1951(a).

### Manner and Means of the Conspiracy to Commit Extortion

17.     It was part of the conspiracy that **MIKERIN** and his co-conspirators planned to and did extort money and other things of value from Victim One.

18.     It was further part of the conspiracy that **MIKERIN** and his co-conspirators threatened Victim One with the cessation of his contracts with TENEX if he failed to pay money and other things of value to the **MIKERIN** and his co-conspirators.

19.     It was further part of the conspiracy that **MIKERIN** and his co-conspirators communicated with each other via e-mail as part of planning and organizing the extortion.

20.     It was further part of the conspiracy that the **MIKERIN** and his co-conspirators would enrich themselves and share the proceeds from the extortion conspiracy.

4

21.     It was further part of the conspiracy that **MIKERIN** and his co-conspirators would direct Victim One to send money and other things of value for the benefit of **MIKERIN** and his co-conspirators to various overseas financial bank accounts in Latvia, Cyprus, and Switzerland held in the name of sham corporations.

### Overt Acts

22.     During the course of and in furtherance of the conspiracy, and to effect the objects thereof, **MIKERIN** and others committed or caused to be committed the following acts, among others, in the District of Maryland and elsewhere:

a.     In or about 2009, **MIKERIN** executed a contract between Victim One and TENEX to provide TENEX with "lobbying and consulting services," and further provided that Victim One was to receive $150,000 for this contract over a period of three months.

b.     In or about November 2009, **MIKERIN** demanded that Victim One transfer one third of the contract payment ($50,000) to Corporation B in order to maintain the contract with TENEX.

c.     On or about November 27, 2009, Victim One transferred $35,000 to Corporation B at **MIKERIN's** direction.

d.     In or about late 2009, **MIKERIN** arranged for Victim One to enter into a second contract with TENEX, under which Victim One was to receive $550,000 over eleven months.

e.     In or about late 2009, **MIKERIN** demanded that Victim One pay **MIKERIN** roughly one half of the contract payments on the $550,000 contract by providing **MIKERIN** a $50,000 kickback every other month via a wire transfer to Corporation B.

f.     On about May 6, 2010, Victim One transferred $50,000 to Corporation B at

5

**MIKERIN's** direction.

        g.     On or about May 17, 2010, Victim One transferred $50,000 to Corporation B at **MIKERIN's** direction.

        h.     In or about 2011, Victim One entered into a third contract with TENEX, again directed by **MIKERIN**, for an additional eleven months.   **MIKERIN** again demanded that Victim One pay kickback payments in order to maintain the contract with TENEX.

        i.     In or about late 2011, **MIKERIN** directed Victim One to make the payments to Corporation A.

        j.     On or about January 12, 2011, **MIKERIN** emailed Victim One from a new email account pretending to be someone **MIKERIN** referred to only as a "Friend."   **MIKERIN** wrote, "We have been informed you are ready to proceed with 50k... please use the same way as the 'window' is opened for you till Monday, January 17... It was also coordinate internally and Final Transfer 2010 in your favour (50K) is on the way (following our best knowleges [sic] will arrive next Tuesday-Wednesday) and that is why we would like to request you to arrange 25K in 5 yellow envelopes (you should be aware) the next week to finalize all outstanding balances."

        k.     On or about January 17, 2011, **MIKERIN** emailed Coconspirator One, stating, "As promised my people suggest this channel only for your cakes.   May be we will coordinate to cook a small one when you are prepared, but it's better to try asap."   Attached to this email was a document that provided bank account and routing information for Corporation A.

        l.     On or about January 18, 2011, Victim One transferred $50,000 to Corporation B at **MIKERIN's** direction, for what Victim One understood to be a necessary transaction to maintain a contract with TENEX.

        m.     On or about January 25, 2011, Victim One paid **MIKERIN** $25,000 in

United States currency, separated into five separate payments of $5,000 each and packaged in small yellow envelopes.

n.      On or about February 2, 2011, **MIKERIN** emailed Victim One, again pretending to be someone else, directing that Victim One not refer to the payments bearing any relation to the nuclear industry, stating, "Please pay your personal attention to our STRICT REGULATIONS that NO ONE doc should refer to any nuclear/hazard/flame/military products and connected service & trading or transportation of such a products [sic].   Hope you should understand this absolute demand of the System and accept safety conditions for our clients.   Any other services like consulting, trading, facilitation, teaching, project & calculation etc. with general or industrial products are welcomed as a matter of the agreement with [Corporation B]."

o.      On or about February 28, 2011, Victim One transferred $50,000 to Corporation B at **MIKERIN**'s direction.

p.      On or about April 25, 2011, Victim One transferred $50,000 to Corporation B at **MIKERIN's** direction.

q.      On or about September 2, 2011, Victim One transferred $50,000 to Corporation A at **MIKERIN**'s direction.

r.      On or about October 25, 2011, Victim One emailed **MIKERIN**, stating, "Please note yesterday we informed your associate that we are sending one half of the payment (25,000) today and will be giving him the other half on Friday per your request."

s.      On or about October 25, 2011, Victim One transferred $25,000 to Corporation A at **MIKERIN's** direction.

t.      On or about October 28, 2011, Victim One paid **MIKERIN** $25,000 in United States currency.

u.      On or about January 23, 2012, Victim One paid **MIKERIN** $50,000 in United States currency.

18 U.S.C. § 1951(a)

## FORFEITURE ALLEGATION

The Grand Jury for the District of Maryland further finds that:

1.　　　　Pursuant to Fed. R. Crim. P. 32.2 notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Sections 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of the defendant's conviction under Count One of this Indictment.

2.　　　　As a result of the offense alleged in Count One of this Indictment, the defendant,

### VADIM E. MIKERIN,

shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), all property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of such violation.　The property to be forfeited includes, but is not limited to, $585,000, and all interest and proceeds traceable thereto, in that such sum in aggregate is proceeds obtained, directly or indirectly, as a result of such violation.

3.　　　　If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

　　　　　　　a.　　　　cannot be located upon the exercise of due diligence;

　　　　　　　b.　　　　has been transferred or sold to, or deposited with, a third person;

　　　　　　　c.　　　　has been placed beyond the jurisdiction of the Court;

　　　　　　　d.　　　　has been substantially diminished in value; or,

　　　　　　　e.　　　　has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to 28 U.S.C. § 2461(c) and 21 U.S.C. § 853(p), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property,

that is, $585,000.


18 U.S.C. § 981(a)(1)(C)
28 U.S.C. § 2461(c)

_____
Rod J. Rosenstein
United States Attorney


A TRUE BILL:


**SIGNATURE REDACTED**
Foreperson

_____11/12/2014_____
Date