**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(GREENBELT)**

UNITED STATES OF AMERICA,

v.

VADIM MIKERIN

Criminal No.: 8:14-CR-00529-TDC
8:14-MJ-01649-WGC

**DEFENDANT VADIM MIKERIN'S MOTION TO
<u>RECONSIDER DETENTION ORDER AND MEMORANDUM OF LAW</u>**

# TABLE OF CONTENTS

Page

I. PROCEDURAL BACKGROUND ................................................................. 1

II. VADIM MIKERIN ...................................................................................... 3

III. ARGUMENT ............................................................................................... 5

    A. The Bail Reform Act Favors Pre-Trial Release; Detention is an Option of Last Resort. ...................................................................... 5

    B. The Indictment's Scope is More Narrow than Projected by the Government and Does Not Incentivize Flight. .................................... 6

    C. Foreign Nationals Charged with Corruption are Commonly Released on Bail .............................................................................................. 9

    D. Mr. Mikerin Proposes Conditions that Will Reasonably Assure His Future Appearance. ............................................................................ 14

        1. Enhanced GPS Monitoring and Steel-Encased Cuff ............... 14

        2. Mr. and Mrs. Mikerin's Life Savings as Bond ....................... 16

        3. Home Confinement in Custody of His Wife ............................ 16

        4. Surrender of Passports and Other Conditions the Court Deems Appropriate ............................................................................. 17

    E. The Government's Arguments at The Detention Hearing Are Based on Faulty Assumptions. ....................................................................... 17

        1. Mr. Mikerin is Not a Russian Oligarch ................................... 18

        2. Mr. Mikerin Does Not Have Access to a Vast Network of Rich Russian Friends. .................................................................... 21

        3. The Government Does Not Consider Mr. Mikerin to be a Significant Flight Risk ............................................................ 22

    F. ADDITIONAL CONSIDERATIONS JUSTIFY MR. MIKERIN'S RELEASE ........................................................................................ 23

        1. Mr. Mikerin Is Unable to Prepare His Defense While Detained ............ 23

        2. The Potential Length of Detention Justifies Release ............... 25

III. THE FOLLOWING COMBINATION OF CONDITIONS REASONABLY ASSURE MR. MIKERIN'S FUTURE APPEARANCE ............................... 25

IV. CONCLUSION ........................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*United States v. Blauvelt*,
 No. CRIM. WDQ-08-0269, 2008 WL 4755840 (D. Md. Oct. 28, 2008) ...............5, 10, 24, 25

*United States v. DeBeir*,
 16 F. Supp. 2d 592 (D. Md. 1998) ........................................................................................8

*United States v. Dunham*,
 No. 8:11-cr-00661-PWG (D. Md. filed Dec. 07, 2011).........................................12, 13, 14, 15

*United States v. Elgawhary*,
 No. 8:14-cr-00068 (D. Md. filed Feb. 2, 2014) ...............................................................13, 14

*United States v. Gonzales Claudio*,
 806 F.2d 334 (2d Cir. 1986)................................................................................................26

*United States v. Khashoggi*,
 717 F. Supp. 1048 (S.D.N.Y. 1989).................................................................................6, 14

*United States v. Mo Yun*,
 No. 4:13-cr-147 (S.D. Iowa filed Dec. 13, 2013) ..................................................10, 11, 14, 15

*United States v. Modanlo*,
 No. 8:10-cr-00295-PJM (June 8, 2010 D. Md.).....................................................................14

*United States v. Motamedi*,
 767 F.2d 1403 (9th Cir. 1985) ........................................................................................6, 14

*United States v. Posada Carriles*,
 481 F. Supp. 2d 792 (W.D. Tex. 2007)...................................................................................8

*United States v. Salerno*,
 481 U.S. 739 (1987)......................................................................................................5, 23

*United States v. Rubashkin*,
 No. 08-cr-1324-LRR (N.D. Iowa June 28, 2009) ...................................................................15

*United States v. Stewart*,
 19 F. App'x 46 (4th Cir. 2001) ............................................................................................5

*United States v. Thomas*,
 No. CRIM. CCB-03-0150, 2006 WL 140558 (D. Md. Jan. 13, 2006) ....................................23

*United States v. Yeh*,
   No. 3:08-CR-96-P, 2013 WL 6568118 (N.D. Tex. Dec. 13, 2013)........................................14

*United States v. Yijia Zhang*,
   No. CRIM.A. 12-498, 2014 WL 5285928 (E.D. Pa. Oct. 16, 2014) ....................10, 11, 12, 14

**Statutes**

18 U.S.C. § 1030(a) ..............................................................................................................11

18 U.S.C. § 1030(c) ..............................................................................................................12

18 U.S.C. § 1951(a) ............................................................................................................7, 8

18 U.S.C. § 1951(b) ................................................................................................................8

18 U.S.C. § 3142 ............................................................................................................1, 5, 6

18 U.S.C. § 3146(b) ................................................................................................................9

**Other Authorities**

73 Fed. Reg. 7705 (Feb. 11, 2008) *available at*
   http://enforcement.trade.gov/agreements/08-608.txt ................................................................3

Bilateral Extradition Treaties: Egypt, Article III, 1874 U.S.T. LEXIS 17 ....................................14

U.S. Department of Energy, Office of International Affairs, Agreement Between
   the Government of the United States of America and The Government of the
   Russian Federation Concerning the Disposition of Highly Enriched Uranium
   Extracted From Nuclear Weapons (Feb. 18, 1993) *available at*
   http://energy.gov/sites/prod/files/pi_iec_local/098b7ef98002cabd.pdf (last
   accessed Dec. 8, 2014)..............................................................................................................3

**DEFENDANT VADIM MIKERIN'S MOTION TO
RECONSIDER DETENTION ORDER AND MEMORANDUM OF LAW**

Pursuant to 18 U.S.C §§ 3142(f), Vadim Mikerin moves this Court for reconsideration of

its Order of Detention entered on November 6, 2014, and for an expedited hearing and ruling on

this Motion for Reconsideration (the "Motion").  Detention is inappropriate in this case and with

this Motion, Mr. Mikerin brings new, relevant factors and precedent to the Court's attention

including: (1) the reduced scope of the indictment faced by Mr. Mikerin as compared to the

complaint pending at the time of the detention hearing and the resultant reduced sentencing

guidelines exposure; (2) examples of similarly situated foreign nationals released on bail –

including where there was no extradition treaty with the defendant's home country; (3)

clarification of several inaccuracies relied upon the government during the detention hearing; and

(4) a new proposed package of strict conditions that will reasonably assure Mr. Mikerin's

appearance at trial and future court proceedings.  Mr. Mikerin respectfully asks this Court for an

expedited hearing to reconsider its Order of Detention and release Mr. Mikerin subject to the

terms discussed below.

I.     **PROCEDURAL BACKGROUND**

On October 29, 2014, Mr. Mikerin was arrested on a criminal complaint alleging money

laundering violations and an elaborate extortion scheme involving multiple victims and

$1,700,000 in kickback payments (the "Complaint").[1]  During the four hours preceding his

arrest, Mr. Mikerin spoke with agents of the Federal Bureau of Investigation ("FBI") and was

offered the opportunity to go home that night if he cooperated with the government's

investigation.  Despite speaking candidly with the FBI agents and facilitating an orderly search

---

[1] *See* Compl. and Gadren Aff. in Support of Criminal Compl. 9, ECF No. 8.

of his office, the government was apparently not satisfied with Mr. Mikerin's responses during the interrogation and he was arrested.

On November 6, 2014, this Court held a hearing to determine whether Mr. Mikerin was a danger to the community or a risk of flight, and if there was a condition or combinations of conditions that could reasonably assure his appearance at trial (the "Detention Hearing").  At the Detention Hearing, the government immediately conceded that Mr. Mikerin did not pose a danger to the community and the sole basis for its seeking detention was risk of flight.[2]  The Court agreed that Mr. Mikerin was not a danger to the community and ordered pre-trial detention based solely on risk of flight.[3]

On November 12, 2014, six days after the Detention Hearing, the Grand Jury returned an Indictment against Mr. Mikerin containing charges significantly more narrow than those alleged in the Complaint.  Specifically, the Indictment charged Mr. Mikerin with one count of conspiracy to commit extortion alleging only one victim, just $585,000 in alleged kickbacks and no money laundering scheme.[4]

Undersigned counsel were retained following the Detention Hearing and Indictment and so did not have the opportunity to study Mr. Mikerin's circumstances and bring them to the Court's attention at or prior to the hearing.

---

[2] *See* Detention Hr'g Tr. 5 ("Just to make clear, the government is not relying in any way on the dangerousness prong.").

[3] Detention Hr'g Tr. 47-49.

[4] Indictment 6-8, 9, ECF No. 11.  The Indictment actually only specifies $460,000 in alleged kickback payments. The forfeiture allegations, however, reference a total of $585,000 in illicit payments.  For the purposes of this Motion, Mr. Mikerin will assume the government alleges the higher number as the amount of kickback payments.

## II.    VADIM MIKERIN

Vadim Mikerin is a fifty-five year old businessman who was born in Moscow and has

resided in Chevy Chase, Maryland for the past three years with his wife of over thirty years.

After the fall of the Soviet Union in 1991, Mr. Mikerin searched for employment opportunities

that would allow him to interact with the West.  He joined JSC Techsnabexport ("TENEX"), the

leading international supplier of Russian uranium products, in 1990.  TENEX is a subsidiary of

the Russian State Atomic Energy Corporation ("ROSATOM").  In February 1993, the United

States and the Russian Federation entered into the Megatons to Megawatts Program, under which

the equivalent of 20,000 nuclear warheads were converted to provide fuel for American power

plants.[5]  TENEX implemented the commercial portion of the program on behalf of ROSATOM.

Over the course of two decades, Mr. Mikerin successfully managed TENEX's agreements with

its counterpart, the United States Enrichment Corporation ("USEC").

Based on the success of the prior agreement and demands for increased competition

within the industry, the United States and the Russian Federation entered into a new agreement

in February 2008.[6]  The new agreement allowed Russian companies to provide uranium products

directly to American utilities without the need to contract with USEC, the Department of

Energy's commercial agent.  The new agreement took effect in 2011.[7]  In anticipation of this

---

[5]  *See* U.S. Department of Energy, Office of International Affairs, Agreement Between the Government of the
United States of America and The Government of the Russian Federation Concerning the Disposition of Highly
Enriched Uranium Extracted From Nuclear Weapons (Feb. 18, 1993) *available at*
http://energy.gov/sites/prod/files/pi_iec_local/098b7ef98002cabd.pdf (last accessed Dec. 8, 2014).

[6]  *See* Amendment to the Agreement Suspending the Antidumping Investigation on Uranium From the Russian
Federations, 73 Fed. Reg. 7705 (Feb. 11, 2008) *available at* http://enforcement.trade.gov/agreements/08-608.txt (last
accessed Dec. 8, 2014).

[7]  *Id.* at 7706.

new market, TENEX created "TENAM", a U.S.-based subsidiary that began doing business in August 2010.  TENEX asked Mr. Mikerin to represent TENAM in the United States.

Mr. Mikerin and his wife Tatiana Mikerin moved to the United States, specifically Chevy Chase, Maryland, in December 2011.  Setting aside business trips to Moscow and elsewhere to attend nuclear industry related conferences, Mr. Mikerin and his wife have lived in an apartment on Wisconsin Avenue in Chevy Chase Maryland ever since.  Mr. Mikerin renewed his L1 Visa in August 2014, and initiated the process of obtaining lawful permanent residence shortly thereafter.  Indeed, Mr. Mikerin met with Marko Maglich, an immigration attorney with Jackson Lewis, and scheduled a second meeting for November 4, 2014.  Mr. Mikerin's arrest prevented this second meeting.  Mr. Mikerin has no prior criminal history.  Over the course of Mr. Mikerin's extensive interactions with the United States during his career, he established many professional relationships and friendships in the United States – many of which span decades. Exhibit A to this Motion contains letters outlining the extent of these relationships from several of Mr. Mikerin's friends here in the United States.

Mr. Mikerin has two children, Denis Mikerin, age 27, and Liubov Mikerin, age 32.  Both children are successful, independent adults with stable jobs.  Denis primarily resides in Moscow and Liubov also resides in Moscow with her husband and their child.  In addition, Mr. Mikerin provides the financial support for his 80 year old mother-in-law.  His mother-in-law suffers from diabetes, heart disease, and age-related mental disorders that require two full-time nurses.

## III.    ARGUMENT

### A.    The Bail Reform Act Favors Pre-Trial Release; Detention is an Option of Last Resort

As this Court is aware, "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."[8]  Indeed, under the Bail Reform Act, the starting point for determining a defendant's custodial status pending trial is release – without conditions. "The judicial officer shall order pre-trial release of the person on personal recognizance, or upon execution of an unsecured appearance bond . . . . unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required[.]"[9]  Should the judicial officer determine that conditions are necessary, the judicial officer "shall order the pretrial release of the person . . . subject to *the least restrictive* further condition, or combination of conditions, that such judicial officer determines will reasonably assure the appearance of the person as required[.]"[10]  Detention is an extreme option, and in order to detain a person pending trial, the government must prove that "*no condition or combination of conditions* will reasonably assure the appearance of the person as required[.]"[11]  In enacting the Bail Reform Act, Congress explicitly stated that "[n]othing in [the Act] shall be construed as modifying or limiting the presumption of innocence."[12]  Any doubts "regarding the propriety of release should be resolved

---

[8]  *United States v. Salerno*, 481 U.S. 739, 755 (1987).

[9]  18 U.S.C. § 3142(b).

[10]  18 U.S.C. § 3142(c)(1)(B) (emphasis added).

[11]  18 U.S.C. § 3142(e)(1); *United States v. Stewart*, 19 F. App'x 46, 48 (4th Cir. 2001).

[12]  18 U.S.C. § 3142(j); *United States v. Blauvelt*, No. CRIM. WDQ-08-0269, 2008 WL 4755840, at *6 (D. Md. Oct. 28, 2008) ("The probability and consequences of defendant's prospective acts must be balanced against the restraint on defendant's liberty as he is presumptively innocent.").

in favor of the defendant."[13]  While risk of flight alone may be sufficient to order detention, the

absence of allegations of violence or narcotics – as in this case – "militates in favor of pretrial

release."[14]

In determining if release conditions exist that will reasonably assure a person's

appearance at trial, courts consider: (1) the nature and circumstances of the crime; (2) the weight

of the evidence against the person; and (3) the history and characteristics of the person, including

the person's character, physical and mental condition, family ties, employment, community ties,

financial resources and criminal history.[15]  The weight of the evidence is the least important

factor, while the history and unique characteristics of the defendant is the most important.[16]

Conditions can be fashioned to reasonably assure Mr. Mikerin's future presence at trial; thus, the

extreme option of pre-trial detention is not necessary or appropriate in this case.

**B.     The Indictment's Scope is More Narrow than Projected by the Government and Does Not Incentivize Flight**

At the Detention Hearing, the government attempted to impress upon the Court the

expansive nature of the charges in the then-pending Complaint and the even larger scheme to be

presented in its indictment of Mr. Mikerin.[17]  The government proffered that Mr. Mikerin

received kickbacks totaling between $1.6 and $2 million[18] and further stated: "again, the core of

---

[13]  *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985) (citation omitted).

[14]  *United States v. Khashoggi*, 717 F. Supp. 1048, 1051 (S.D.N.Y. 1989).

[15]  *See* 18 U.S.C. § 3142(g).

[16]  *See* Detention Hr'g Tr. 40; *see also United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985) (noting that "the weight of the evidence is the least important of the various factors" and reversing the lower court's order detaining an Iranian citizen).

[17]  Detention Hr'g Tr. 6-7.

[18]  Detention Hr'g Tr. 6-7 (". . . the Government has evidence that he has directed the deposit of over $1.6 million, actually closer to $2 million into accounts in which he at least has partial control . . ."); Detention Hr'g Tr. 45 ("The

the complaint that's currently lodged against Mr. Mikerin is the smaller extortion scheme.  But the government is prepared and will soon seek an indictment on the larger scheme involving these other U.S. companies."[19]  The Court expressed concern that the twenty year maximum sentence Mr. Mikerin was presumably to face was an incentive for Mr. Mikerin to flee.[20]

The expansive indictment promised by the government did not come to pass.  Rather, the Grand Jury returned an Indictment that alleges a kickback scheme even more modest than the one alleged in the Complaint.  Specifically, the Indictment charges Mr. Mikerin with one count of Conspiracy to Interfere with Interstate Commerce by Extortion in violation of 18 U.S.C. § 1951(a).  The amount of kickback payments alleged in the Indictment is $585,000 – a far cry from the $1,700,000 alleged in the Complaint[21] and the even larger amounts proffered at the Detention Hearing.[22]  Further, the Indictment contains no money laundering charges, substantive counts of extortion, or any other offenses.  While the government would like the Court to focus on the statutory maximum sentence of the conspiracy charge, an analysis of the potential guideline sentence presents a drastically different picture – one that weighs heavily in favor of pre-trial release.

---

Government has proffered today in open court that there are other kickbacks that the Government has knowledge of. And these involve millions of dollars that are deposited in offshore accounts.").

[19] Detention Hr'g Tr. 16.

[20] Detention Hr'g Tr. 48 ("And I'm also concerned about the fact that this, if convicted does carry a maximum penalty of 20 years.  With all of one's family situation, income, history, background, and the like in another nation, one wonders why one would remain in the United States to face trial and perhaps very serious penalties if convicted.").

[21] *Compare* Compl. and Gadren Aff. in Support of Criminal Compl. 6-9, *with* Indictment 5-8.

[22] *See* Detention Hr'g Tr. 6-7.

Based on the allegations set forth in the Indictment, Mr. Mikerin's sentencing guidelines are as

follows:[23]

| | | |
|---|---|---|
| 2B3.2(a) | Base Offense Level | 18 |
| 2B3.2(b)(2) | If offense is greater than $10,000, increase by the number of levels in the table at 2B3.1(b)(7) | |
| 2B3.1(b)(7)(h) | If loss is greater than $250,000, but less than $800,000 add 4. | +4 |
| | [Indictment states forfeitable loss at $585,000] | |
| | Offense Level Conduct: | 22        (41-51 months) |

Even if one assumes the loss amount referenced in the Complaint, $1,700,000, the

offense level increases by only one point, resulting in a total offense level of 23 and a sentencing

range of 46-57 months.  This is a potential sentence – without including a reduction should Mr.

Mikerin decide not to proceed to trial – of less than five years at the high end.[24]  Significantly,

the consequences of Mr. Mikerin fleeing could be equal to or greater than the guidelines sentence

outlined above, and would be served consecutively to any post-conviction sentence.[25]  Under

these circumstances, every incentive is for Mr. Mikerin *not* to flee.

---

[23]  Calculations based on 2011 Sentencing Guidelines Manual and the November 12, 2014 Indictment charging Mr. Mikerin with conspiracy to commit extortion in violation of 18 U.S.C. §§ 1951(b)(a) and 1951(a).  Per Appendix A of the Sentencing Guidelines Manual, Section 2B3.2 is the appropriate guidelines section for Section 1951 offenses.

[24]  *See, e.g.*, *United States v. DeBeir*, 16 F. Supp. 2d 592, 595 (D. Md. 1998) (noting that the defendant's potential sentence of twelve to eighteen month "further reduces the risk of flight, especially in light of the assets [the defendant] has posted"); *United States v. Posada Carriles*, 481 F. Supp. 2d 792, 796 (W.D. Tex. 2007) (finding that the nature and circumstances of the offense weigh in favor of the defendant when, *inter alia*, the recommended statutory guideline range for punishment of the offenses charged is relatively low).

[25]  Bail jumping carries a penalty of up to five years imprisonment. 18 U.S.C. § 3146(b)(1)(A)(ii).

The government may once again claim that it expects to bring additional charges against Mr. Mikerin that carry stiffer penalties than the single count Indictment presently before the Court. Such predictions have no bearing on the state of the case today. The simple fact is that Mr. Mikerin has not been charged with anything other than what is contained within the four corners of the present Indictment. Mr. Mikerin should not be forced to address, and this Court should not be asked to consider, hypothetical allegations. Even if the government ultimately were to include additional charges with higher potential penalties, this remains a situation where conditions can be fashioned to reasonably assure Mr. Mikerin's appearance.

### C.        Foreign Nationals Charged with Corruption are Commonly Released on Bail

As is true with most alleged white collar crimes, foreign nationals charged with corruption appear to be commonly released pending trial. In order to readily find what we assume to be the most robust collection of foreign nationals charged with corruption in the United States, the undersigned conducted a survey of all arrested defendants charged with violations of the Foreign Corrupt Practices Act ("FCPA") since 2000. *See* Exhibit B. FCPA charges carry much higher potential penalties than extortion charges as the FCPA sentencing guideline section is based on the loss table found in Chapter 2B1.1 of the Sentencing Guidelines, as opposed to the extortion loss table found in Chapter 2B3.1. The 2B1.1 loss table is significantly harsher and often generates potential guideline sentences of well over ten years, as opposed to the less than five years applicable to Mr. Mikerin's alleged offense. Of the 112 individuals arrested for FCPA offenses since 2000, twenty-three were foreign nationals. All of these individuals, including the foreign nationals, were released prior to trial.

As the statistics above illustrate, courts across the United States have rigorously and creatively explored all possible conditions, given the presumption against pre-trial detention, to fashion conditions that reasonably assure the defendant's appearance at trial.  Indeed, the standard for conditions of release under the Bail Reform Act does not require that the conditions *guarantee* a defendant's presence at future proceedings, but "*reasonably assure*" the defendant's presence.[26]  Release is the norm – not the exception – and neither the absence of an extradition treaty or the lack of ties to the United States alters this foundation principal.

In addition to the FCPA defendants discussed above, courts have found sufficient conditions in numerous instances for foreign nationals with extremely limited ties to the United States, despite the absence of an extradition treaty.  In *United States v. Mo Yun*, the court granted pre-trial release with conditions that included electronic monitoring and a curfew.[27]  In *Mo*, the defendant was a Chinese foreign national arrested while boarding a flight to return to Beijing.[28]  Aside from her brother, who was also indicted, the defendant had no ties to the United States.[29]  Her husband was a prominent CEO who lived in China and, according to Forbes Magazine, was worth $1.4 billion.[30]  The United States does not have an extradition treaty with China.  The defendant had less ties to the U.S. than Mr. Mikerin, substantially more assets than Mr. Mikerin,

---

[26] *See e.g.*, *United States v. Yijia Zhang*, No. CRIM.A. 12-498, 2014 WL 5285928, at *6 (E.D. Pa. Oct. 16, 2014) ("[T]he Bail Reform Act 'does not require that the risk be zero, but that conditions imposed reasonably assure appearance.'") *citing United States v. Madoff*, 586 F.Supp.2d 240, 249 (S.D.N.Y.2009) (emphasis added); *see also United States v. Blauvelt*, No. CRIM. WDQ-08-0269, 2008 WL 4755840, at *6 (D. Md. Oct. 28, 2008) ("The Bail Reform Act requires a reasonable assurance of the safety of the community, not a guarantee.").

[27] *United States v. Mo Yun*, No. 4:13-cr-147 (S.D. Iowa filed Dec. 13, 2013), Order Granting Defendant Mo Yun's Motion for Pretrial Release With Conditions, ECF No. 90.

[28] *Id*. at 2.

[29] *Id*. at 4.

[30] *Id.*

and significantly more powerful contacts in a non-extradition country than Mr. Mikerin;

however, the court found that the following conditions satisfied the requirements of the Bail

Reform Act and reasonably assured her appearance at trial: (1) a cash appearance bond of

$250,000; (2) surrender passport and obtain no new passports or international travel documents;

(3) GPS location monitoring; (4) curfew of 10:00 p.m. to 7:00 a.m.; (5) residence in Iowa

approved by Pretrial Services; (6) travel restricted to Southern District of Iowa; (7) no ingress to

airports, seaport, railroad, or bus terminal without prior authorization; and (8) other standard

conditions of supervision.[31]

As discussed below, Mr. Mikerin has nowhere near the resources of the defendant in *Mo*

and already has a place to live in the United States – the same place he and his wife have lived

for three years.  Mr. Mikerin should not be treated worse than the defendant in *Mo* and should be

afforded conditions at least on par with the defendant in that case.

In October 2014, in *United States v. Yijia Zhang*, the Federal Court for the Eastern

District of Pennsylvania also released a Chinese defendant with conditions including a cash

bond, electronic monitoring, and the requirement that he live with a distant acquaintance.[32]  In

*Zhang*, the defendant was accused of damaging the server of his employer, the Vanguard Group,

in an attempt to cover up his alleged theft of internal company documents in violation 18 U.S.C.

§ 1030(a)(5)(A) and § 1030(c)(4)(A)(i)(I).[33]  The government estimated his sentence would be

between 51 and 63 months.[34]  As a condition of release, the defendant proposed appointing a

---

[31]  *Id.* Order Setting Conditions of Release, ECF No. 90-1.

[32]  *United States v. Yijia Zhang*, No. CRIM.A. 12-498, 2014 WL 5285928, at *4 (E.D. Pa. Oct. 16, 2014).

[33]  *Id*. at 1.

[34]  *See id.* Government's Response to Renewed Motion for Pretrial Release at 5, ECF No. 59.

third-party custodian to assure his appearance at trial.[35]  The court learned that the relationship "was nonexistent for over a decade and, most importantly, was revived by [the defendant] for the purpose of securing a potential third party custodian."[36]  Nevertheless, and despite determining that the defendant "continue[d] to present a substantial risk of nonappearance," the court noted that "the Bail Reform Act does not require that the risk be zero, but that conditions imposed reasonably assure appearance."[37]

Unlike the defendant in *Zhang*, Mr. Mikerin will not have to rely on a "revived" relationship for a third-party custodian.  Mr. Mikerin proposes to live with his wife of 33 years as they await the outcome of these proceedings together.

Recently, in *United States v. Dunham*, this Court considered whether pre-trial detention was warranted in the case of two British citizens charged with Conspiracy, Wire Fraud, Money Laundering, and Aiding and Abetting, and found pre-trial release appropriate.[38]  The Court initially determined that the defendants presented a risk of flight that could not be mitigated based on any combination of conditions.[39]  The Court later reconsidered its decision and

---

[35]  *Zhang*, 2014 WL 5285928, at *2.

[36]  *Id*. at *4.

[37]  *Id*. at *6 (quotations omitted).  The conditions included: (1) The defendant shall post a bond of Five Hundred Thousand Dollars ($500,000), the entirety to be secured by cash; (2) Upon the payment of bond, the defendant shall be released to the home of Omar Tirado, 740 North 5th Street, Lancaster, PA; (3) The defendant shall not travel outside the Eastern District of Pennsylvania (4); The defendant shall surrender all passports and visas to Pretrial Services and shall not apply for any passports or other travel documents; (5) The defendant shall be subject to location monitoring via a Global Positioning System device and shall be allowed to leave the home [the third party custodian] with Pretrial Services authorization for employment, medical, and legal reasons only. [The Defendant] shall pay all costs associated with electronic monitoring; (6) The defendant shall not change residence without prior approval of Pretrial Services; and (7) The defendant shall not travel within 100 yards of any places of egress, including airports, shipping ports, interstate train stations, or any foreign embassies or consulates, without the prior approval of Pretrial Services for legal purposes only.  *See id.* Order, ECF No. 83.

[38]  *United States v. Dunham*, No. 8:11-cr-00661-PWG (D. Md. filed Dec. 07, 2011).

[39]  *See id.* Orders of Detention, ECF Nos. 30 and 31.

concluded that the defendants' future presence was reasonably assured by GPS monitoring that restricted the defendants to the home of a third-party custodian, $250,000 in secured and unsecured forfeiture bonds, and forfeiture of passports.[40]  At the Detention Hearing in this case, the government described the Dunham case as "an entirely different situation[,]" because the U.K. had extradited the Dunhams once before, and "[t]here's a strong relationship and that's embodied and codified in an extradition treaty between the United States and the U.K."[41]  The government's reliance on this distinction is misplaced.  Common sense counsels that if the Dunhams were to have fled the U.S., the U.K., which extradited them once already, is the last place to which they would flee.  Indeed, individuals once extradited are most likely to flee to a country without an extradition treaty with the U.S.  Therefore, the existence of an extradition treaty is not persuasive: they would not go there anyway.

Finally, this Court recently decided that pre-trial release was warranted in the case of *United States v. Elgawhary*.[42]  The defendant was a dual U.S. and Egyptian citizen indicted for wire fraud, conspiracy to launder money, interfering with the administration of the Internal Revenue laws, and aiding and abetting.[43]  While the United States and Egypt have an extradition treaty, none of these charges are enumerated in the treaty as grounds for extradition.[44]  Put another way, the offense charged was not extraditable, rendering the existence of an extradition treaty with Egypt a moot point as it relates to this defendant.  Thus, despite the risk that the defendant could flee to Egypt and avoid extradition, the Court granted his release conditioned

---

[40]  *See id.* Orders Setting Conditions of Release, ECF Nos. 66 and 67.

[41]  *See* Detention Hr'g Tr. 37-38.

[42]  *United States v. Elgawhary*, No. 8:14-cr-00068 (D. Md. filed Feb. 2, 2014).

[43]  *Id.* Indictment, ECF No. 18.

[44]  *See* Bilateral Extradition Treaties: Egypt, Article III, 1874 U.S.T. LEXIS 17.

upon location monitoring, a bail bond secured by equity in various properties, and the appointment of third-party custodians to whom the defendant was related.[45]

### D.   Mr. Mikerin Proposes Conditions that Will Reasonably Assure His Future Appearance

As evidenced by cases such as *Yun, Zhang*, *Dunham,* and *Elgawhary,* there are indeed conditions that can be fashioned to reasonably assure Mr. Mikerin's appearance at further proceedings and trial in this matter.[46]  Mr. Mikerin and the undersigned have put together such conditions and they are significantly more robust than those proposed at the Detention Hearing. The proposed conditions include: (1) enhanced electronic monitoring in addition to Pre-Trial Services standard electronic monitoring; (2) a substantial bond consisting of Mr. Mikerin's life savings; (3) home detention in the custody of his wife; (4) surrender of his passport and his wife's passport; and (4) such other conditions the Court deems appropriate.

#### 1.   Enhanced GPS Monitoring and Steel-Encased Cuff

In addition to the standard electronic monitoring offered by Pre-Trial Services, Mr. Mikerin proposes to also wear an enhanced GPS monitor and upgraded securing mechanism for the GPS as an additional condition of release.  The enhanced electronic monitor and related securing mechanism are highly technical devices operated by a private company and are about as indestructible and accurate as this type of device can be.  Courts widely accept that electronic

---

[45]  *See Elgawhary*, No. 8:14-cr-00068, Orders Setting Conditions of Release, ECF Nos. 8, 17, and 21.

[46]  *See also United States v. Modanlo*, No. 8:10-cr-00295-PJM, Order Setting Conditions of Release, ECF No. 21 (June 8, 2010 D. Md.) (granting pre-trial release to an Iranian citizen); *United States v. Khashoggi*, 717 F. Supp. 1048 (S.D.N.Y. 1989) (granting pre-trial release to Saudi Arabian citizen); *United States v. Yeh*, No. 3:08-CR-96-P, 2013 WL 6568118 (N.D. Tex. Dec. 13, 2013) (granting pre-trial release to a Chinese citizen); *United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985) (granting pre-trial release to an Iranian citizen).

monitoring mitigates the risk of flight and is the primary condition utilized to secure flight in the examples outlined above.[47]

The enhanced electronic monitoring device Mr. Mikerin proposes is the ReliaAlert XC GPS. This device provides additional assurances above the standard electronic monitoring services which Mr. Mikerin proposes to also wear. As noted in the attached technical specifications (attached as Exhibit C), the GPS component of the device provides location updates and assesses compliance every two seconds. The GPS is accurate within six feet and fifty meters. If an individual leaves the specified zone, the GPS will identify Pre-Trial Services or any other individual specified by the Court. The GPS also emits a 95 decibel siren upon violation. Mr. Mikerin proposes to have A.S.A.P., Inc. install and administer the device. A.S.A.P. is a private company that is licensed to provide these services in Maryland, and has monitored offenders in Maryland for the past twenty years. A.S.A.P. is willing and able to coordinate with Pre-Trial Services so that both electronic monitoring systems function in tandem. A representative from the device manufacturer can be available to the Court at a hearing to further discuss its capabilities.

As an additional condition to reasonably assure his future presence, Mr. Mikerin proposes to attach the GPS with a product called the SecureCuff. The SecureCuff is designed to operate in conjunction with the ReliaAlert XC GPS. The SecureCuff has encased, hardened dual steel bands that are highly cut resistant and is also equipped with an internal fiber-optic strap that automatically sends an alert at any signs of tampering. The SecureCuff's technical specifications

---

[47] *See, e.g.*, *United States v. Dunham*, No. 8:11-cr-00661-PWG (D. Md. Dec. 07, 2011); *United States v. Mo Yun*, No. 4:13-cr-147 (S.D. Iowa Dec. 13, 2013 ) Order Setting Conditions of Release ECF No. 90-1; *United States v. Rubashkin*, No. 08-cr-1324-LRR (N.D. Iowa June 28, 2009) Order, ECF No. 199.

are attached as Exhibit D.  The ReliaAlert XC and SecureCuff, operating in tandem with the

standard Pre-Trial Services electronic monitoring, represents a substantial condition that will

reasonably assure Mr. Mikerin's appearance at future proceedings.

2. <u>Mr. and Mrs. Mikerin's Life Savings as Bond</u>

Mr. Mikerin's life savings consists of approximately $120,000 (USD) in his Russian bank

account.  The Mikerins are prepared to pledge their entire savings to this Court as a security for

his appearance.  Counsel has researched the possibility of pledging the money in this account,

and has every belief that the funds can be successfully pledged to this Court and recoverable by

this Court should Mr. Mikerin fail to abide by the terms of his conditions of release.  The

significance of this pledge cannot be understated.  If Mr. Mikerin is able to somehow remove the

enhanced GPS monitoring system and flee the country, he will lose all of his and his wife's

savings.  The full extent of Mr. Mikerin's financial resources is discussed in further detail in Part

E below.  As the Court will see, the $120,000 in the Russian account represents the sum total of

all available assets Mr. Mikerin has the ability to pledge.

In addition to pledging the contents of the Russian bank account, Mr. Mikerin's former

employer has agreed to post an additional bond in the amount of $150,000.

3. <u>Home Confinement in Custody of His Wife</u>

Mr. Mikerin proposes that his revised bond conditions include home confinement at the

apartment in Chevy Chase, Maryland, where he will continue to live, as he has for the past three

plus years, with his wife Tatiana Mikerin.  Mr. Mikerin's home confinement will be very strict,

the only exceptions being meetings with counsel, court appearances, meetings with Pre-Trial

Services, and any emergency medical treatment.  These conditions are more severe than those in

the *Mo* case, where only a curfew – not home confinement – was ordered.

> ### 4. Surrender of Passports and Other Conditions the Court Deems Appropriate

Mr. and Mrs. Mikerin will both surrender their passports to Pre-Trial Services.  And, the

Consular Division of the Embassy of the Russian Federation to the United States of American

guarantees the Court that it will not issue new passports.  *See* Exhibit E.  The fact that Mrs.

Mikerin is willing to surrender her passport is significant.  As difficult as it is to imagine Mr.

Mikerin fleeing given the proposed conditions, it is doubly hard to imagine him either finding the

assistance to also have his wife spirited out of the country or leaving without her.[48]

Part III below contains a full list of proposed conditions in addition to those outlined

above.  If the Court does not believe the proposed conditions are adequate, the Mikerins ask the

Court to set forth any other conditions it deems appropriate.

> ## E. The Government's Arguments at The Detention Hearing Are Based on Faulty Assumptions

The government relied on erroneous assumptions and mischaracterizations in support of

its arguments for pre-trial detention at the Detention Hearing.  These false assumptions and

mischaracterizations include the portrayal of Mr. Mikerin as a rich Russian tycoon with access to

vast sums of money, the assertion that there are "many in Russia . . . who also have significant

assets and could assist him in leaving the country and making it back safely to Russia[,]" and that

the Russian Consulate in "some City in Canada [or] the Russian Consulate in some city in

---

[48] Given Mrs. Mikerin's mother's extremely precarious health, it may be necessary for her to return to temporarily assist her mother if her mother's health significantly deteriorates.  We seek the Court's assistance in fashioning a method for this to be possible on short notice.

Mexico" may assist in smuggling Mr. Mikerin back to Russia.[49]  While the government's assertions may appeal to the imagination, they are wholly inappropriate and contradicted by the actual facts.

### 1.    Mr. Mikerin is Not a Russian Oligarch

The impression of Mr. Mikerin given to the Court as some sort of Russian tycoon or oligarch could not be further from the truth.  Mr. Mikerin's supposed extensive financial resources and ability to tap international contacts was a key focus of the government's argument for detention.  In reality, Mr. Mikerin is a mid-level manager of  average means.  Mr. Mikerin has three bank accounts:

- U.S. Citibank Account (approximately $130,000):  This account was frozen by the government, and thus, Mr. Mikerin cannot access or pledge the contents.

- Russian Account with U.S. Dollars (approximately $120,000):  This account represents the entirety of Mr. Mikerin and Mrs. Mikerin's life savings and was accumulated over many years by saving his salary from TENEX.  As noted previously, the Mikerins are prepared to pledge the total contents of this account to the Court.

- Russian Ruble Account (approximately $109,000):[50]  This account contains roughly 6 million Russian rubles.  Mr. Mikerin uses this account to pay his normal living expenses and to provide for his mother-in-law's medical and living

---

[49]  *See* Detention Hr'g Tr. 7-8.

[50]  The Russian ruble is relatively unstable, and the value of this account fluctuates with the exchange rate.  For example, as of November 21, 2014, the account was valued at approximately $130,000.  As of as of December 8, 2014, the account was worth $111,000, and as of December 10, 2014, the account was worth $109,000.

expenses in Russia which cost approximately $2,500 a month.  Given neither Mr.

Mikerin nor Mrs. Mikerin are currently employed, funds will no longer be

deposited into this account.  If Mr. Mikerin is released, this account will be used

to continue to pay for the Mikerins' living expenses while on release, in addition

to paying the expenses of his mother-in-law.  Aside from being an account used to

pay living and medical expenses, this account fluctuates widely in value on a

daily basis and is not a stable form of security to pledge to the Court regardless.

Mr. Mikerin does not own securities, nor does he have a 401(k) account.  The entire

amount of money in Mr. Mikerin's possession is represented by the Russian bank accounts

outlined above.  Mr. Mikerin has no other bank accounts or access to bank accounts or other

monies anywhere in the world.  Should Mr. Mikerin flee, he stands to lose every penny he has

saved for him and his wife.  The security and disincentive to flee represented by this collateral

cannot be overstated.

In addition to his life savings, Mr. Mikerin shares ownership with his family in the

following real property:

- Apartment  #1 located in Moscow (roughly 560 sq. ft.):  This apartment is co-
  owned by Mr. Mikerin, his wife, his son, and his daughter.  The apartment is
  occupied by Mr. Mikerin's daughter, husband, and their child as their full time
  residence.  The Russian government gave the Mikerins this apartment after the
  fall of the Soviet Union, and many apartments like this one were privatized and
  given to citizens at no cost.  The market value of this apartment, although hard to
  determine with specificity, is approximately $200,000 – $300,000.

- Apartment #2 located in Moscow (roughly 460 sq. ft.):  The studio apartment is occupied by Mr. Mikerin's son and is his son's residence when he is not abroad. Based on advice from his tax consultant, Mr. Mikerin began the process of transferring title to this apartment to his son when he renewed his Visa in August 2014.  It is unclear whether Mr. Mikerin still owns this property.  The approximate market value of this apartment is $400,000.

- Apartment #3 located in Moscow (roughly 960 sq. ft.):  Mr. and Mrs. Mikerin use this apartment as their home when not in the United States.  Mr. Mikerin also began the process of transferring title to this apartment to his wife in August 2014.  It is unclear whether Mr. Mikerin still owns any interest in this property. The approximate market value of this apartment is roughly $500,000.

- The "Dacha" located in the suburbs of Moscow (roughly 215 sq. ft.):  This structure is not what Americans might typically think of upon hearing the word "Dacha."  It is a small structure with no plumbing, no running water, and no gas for heat.  The Dacha is of only nominal value and structures like these are not uncommon for middle class people in Russia.  It is essentially a place to camp under shelter outside of the city over the occasional summer weekend.  A photo of the Dacha is attached as Exhibit F.

As demonstrated above – and in stark contrast to the picture painted by the government – Mr. Mikerin is an average middle class Russian.  He owned an apartment for he and his wife, shared interests in two apartments in which his children reside, and has built up only a modest

retirement – all of which he legitimately earned, and all of which he is prepared to pledge to the Court.

We note that Mr. Mikerin also explored the possibility of pledging his real property to the Court.  After careful consideration and obtaining the advice of Russian counsel, the undersigned came to the conclusion that Russian law governing real property would likely make any security in this property unenforceable by the Court and so this is not one of the conditions being proposed.

2.     Mr. Mikerin Does Not Have Access to a Vast Network of Rich Russian Friends

The government also stated that there are "many in Russia" with access to large sums of cash that can support Mr. Mikerin and "assist him in leaving the country and making it back safely to Russia."[51]  These types of statements are wholly misleading.  There is nothing in the record to support this assertion, and indeed, none of these contacts have appeared from the woodwork to assist Mr. Mikerin in a bail package.  The only people to appear at Mr. Mikerin's side are his family members and friends in America.  If the mysterious Russian friends alluded to by the government were so eager to assist Mr. Mikerin in fleeing this country, one would think that at least one would appear and assist in posting security to make such a plan even possible. The government is hoping to stoke the imagination of this Court with tales of rich powerful Russian friends and access to large sums of money – with absolutely no support.

Mr. Mikerin and his family are willing to do anything within their power to assure the Court of his appearance at trial, and convince the Court of Mr. Mikerin's resolve to remain in the United States and defend the charge against him.  While there are not "many in Russia" waiting

---

[51]  *See* Detention Hr'g Tr. 7.

to assist Mr. Mikerin in his escape, Mr. Mikerin has established numerous relationships with

U.S. Citizens over the course of the past twenty years that vouch for his good character.  Several

of those people have executed letters of support for Mr. Mikerin and those letters are attached to

this filing.  *See* Exhibit A.  These letters paint an accurate picture of a man, father, and husband

who has forged strong relationships in this country, not of someone with no contacts or

attachments to the United States ready to hightail it out of the country at the first opportunity.

       3.      <u>The Government Does Not Consider Mr. Mikerin to be a Significant
Flight Risk</u>

Not even the government truly believes Mr. Mikerin is a significant flight risk.  The

government sought pre-trial detention solely because Mr. Mikerin refused to give it the answers

it was looking for prior to Mr. Mikerin's arrest.  As Agent Taylor explains on page 4 of the

"Form 302" Memoranda of Interview describing the circumstances of his arrest, the FBI

explicitly told Mr. Mikerin that "[p]rovided you cooperate with us, I am more than happy to let

you go home."  Agent Taylor's statement was not a bluff; the government had obtained the

means to follow through with that pledge.  Months prior to the meeting with Mr. Mikerin on the

day of his arrest, the government had sought and received from this Court the unusual authority

not to arrest Mr. Mikerin notwithstanding the filing of a complaint and issuance of an arrest

warrant.[52]  Despite speaking with the agents over the course of several hours, Mr. Mikerin did

not go home: the agents were unsatisfied with Mr. Mikerin's answers and arrested him.  The

government's sincere intention to let Mr. Mikerin go home *that night* belies the government's

---

[52] *See* Motion to Recall Arrest Warrant and Order Granting Same, ECF No. 4.

position that he is a risk of flight.  Pre-trial detention is not punishment.[53]  Mr. Mikerin posed the

same risk of flight at the time of the government's interrogation as he did during the Detention

Hearing as nothing about his financial resources, supposed limited contacts in the United States,

alleged vast network of contacts abroad, or possibility of facing serious charges changed.  The

only difference is that in the first instance, the government was willing to release Mr. Mikerin

without even arresting him.  In the second instance, after Mr. Mikerin refused to give the

government the answers it was apparently looking for, it suddenly characterized Mr. Mikerin as

the "paradigmatic face of a high risk flight."[54]  It is evident from these actions that that the

government is using pre-trial detention as a means to put pressure on Mr. Mikerin to either

cooperate or plead guilty.  This is not an authorized or appropriate use of the Bail Reform Act

and should not be allowed.

### F.    ADDITIONAL CONSIDERATIONS JUSTIFY MR. MIKERIN'S RELEASE

While not specifically enumerated by Congress, courts have looked to other factors that

weigh against pre-trial detention, including the defendant's ability to effectively prepare a

defense, and the length of expected time of detention prior to trial.  Given the unique challenges

presented in this case, these factors further justify Mr. Mikerin's release prior to trial

1.    Mr. Mikerin Is Unable to Prepare His Defense While Detained

Pre-trial detention can materially prejudice an individual's ability to prepare a defense to

government allegations.  In *United States v. Blauvelt*, the government brought a seven count

---

[53] *United States v. Thomas*, No. CRIM. CCB-03-0150, 2006 WL 140558, at *6 (D. Md. Jan. 13, 2006) *citing United States v. Salerno*, 481 U.S. 739, 747 (1987).

[54]  *See* Detention Hr'g Tr. 5.

indictment against the defendant, and alleged a variety of sexual crimes related to a minor.[55]

This Court initially detained the defendant prior to trial based on the danger he presented to the

community.[56]  Upon the defendant's motion to reconsider, however, the court granted the

defendant's release, in part because of the difficulties pre-trial detention caused for trial

preparation.[57]  The court found that "the preparation of the defense in that case required review

of considerable videotapes and other electronic evidence on the possession of child pornography

charge, *which is practically impossible if the defendant remains in detention*."[58]  In this case, the

government has indicated to counsel that it has collected *terabytes* worth of data.  To illustrate

the magnitude of this information, a single terabyte can hold 1,000 copies of the Encyclopedia

Britannica.[59]  The information is in both Russian and English, and consists of documents, videos,

and audio recordings.  Mr. Mikerin must have access to this data in order to sift through it,

identify the relevant material, and effectively prepare his defense.  This is practically impossible

while Mr. Mikerin is detained prior to trial.  This is especially true given the United States

Attorney's Office standard "discovery agreement", which prohibits counsel from providing

copies of the discovery to the client as a condition precedent to receiving discovery.[60]  Given the

amount of data collected, bringing a computer into the detention facility, to be viewed with

counsel present, is not a realistic solution and does not enable Mr. Mikerin to adequately prepare

---

[55] *United States v. Blauvelt*, No. CRIM. WDQ-08-0269, 2008 WL 4755840, at *1 (D. Md. Oct. 28, 2008).

[56] *Id*.

[57] *Id.* at *6.

[58] *Id*. (emphasis added).

[59] *See* "What's a Byte: Megabytes, Gigabytes, Terabytes . . . What Are They?" *available at* http://www.whatsabyte.com/ (Last accessed Dec. 7, 2014).

[60]   United States Attorney's Office Discovery Agreement, ¶6 ("All discovery is provided… on the condition that counsel will <u>not</u> give copies of these materials to the client….[C]ounsel may, of course, <u>review</u> this material with the client at any time or place.")(emphasis in original).

a defense.  Counsel's only option to store and review this quantity of data is to host the information online through an internet server – and the detention facility does not have internet access.  Thus, similar to the defendant in *United States v. Blauvelt*, Mr. Mikerin's ability to prepare his defense while detained is "practically impossible."[61]  Not only is Mr. Mikerin's release justified based on the conditions that reasonably assure his appearance at trial, Mr. Mikerin's release is essential to preparing an adequate defense.

       2.     The Potential Length of Detention Justifies Release

Courts have also evaluated the potential length of pre-trial detention and found that "at some point and under some circumstances, the duration of pre-trial detention becomes unconstitutional."[62]  In Mr. Mikerin's case, the Indictment, while narrower than the Complaint, nevertheless contains allegations that span geographic boundaries, numerous years, and several languages.  While the parties are theoretically proceeding with a speedy trial, in reality, this case will likely take well over a year to resolve.  In the meantime, Mr. Mikerin will remain detained without a trial, with a limited ability to actively participate in his defense, despite the availability of pre-trial release conditions that can mitigate any perceived risk of flight.

**III.    THE FOLLOWING COMBINATION OF CONDITIONS REASONABLY ASSURE MR. MIKERIN'S FUTURE APPEARANCE**

Mr. Mikerin proposes the following full package of conditions to reasonably assure his appearance at trial and at future proceedings.

    1.   Cash bond: $150,000 cash bond offered by Mr. Mikerin's former employer, as well as his entire life savings in Russia.  This consists of approximately $120,000 USD.

---

[61]  *Blauvelt*, 2008 WL 4755840, at *6.

[62]  *United States v. Gonzales Claudio*, 806 F.2d 334, 339 (2d Cir. 1986).

2. In addition to electronic monitoring by Pre-Trial Services, Mr. Mikerin will wear an enhanced GPS device and "SecureCuff," at his own cost. The SecureCuff is a hardened steel encased security cuff that makes removal nearly impossible. Moreover, the GPS sends an immediate alerts if the individual tampers with the device or SecureCuff.

3. Mrs. Mikerin will agree to stay in the United States, and serve as a third-party custodian for Mr. Mikerin.

4. Home confinement at the apartment in Chevy Chase, Maryland. Mr. Mikerin will be confined to his home, and released only for meetings with counsel, court appearances, meetings with Pre-Trial Services, and emergency medical treatment.

5. Mr. Mikerin will report telephonically to Pre-Trial Services every morning, and report in person twice a week or otherwise at the discretion of Pre-Trial Services.

6. Mr. and Mrs. Mikerin will surrender their passports to Pre-Trial Services.

7. As set forth in Exhibit E, the Russian embassy will agree that they will not issue new passports or travel documents to Mr. and Mrs. Mikerin.

8. Any other conditions proposed by the Court.

## IV.    CONCLUSION

Vadim Mikerin urges this Court to reconsider the Order of Detention and enter an order releasing him on bail pending trial with the combinations of conditions proposed, as well as any other conditions the Court deems reasonable.

DATED:  December 11, 2014        Respectfully submitted,

ORRICK, HERRINGTON, & SUTCLIFFE, LLP

By:    /s/ Jonathan E. Lopez
        Jonathan E. Lopez
        William B. Jacobson
        Guy D. Singer

        1152 15th Street, NW
        Washington, D.C. 20005-1706
        Phone: (202) 339 8456
        Fax: (202) 339 8500
        Email:  jonathan.lopez@orrick.com
                  wjacobson@orrick.com
                  gsinger@orrick.com

        ATTORNEYS FOR DEFENDANT
        VADIM MIKERIN

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court of the United States District Court for the District of Maryland using the CM/ECF system on December 11, 2014.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Dated:  December 11, 2014              Respectfully submitted,


ORRICK, HERRINGTON, & SUTCLIFFE, LLP

By:  /s/ Jonathan E. Lopez
     Jonathan E. Lopez
     William B. Jacobson
     Guy D. Singer

     1152 15th Street, NW
     Washington, D.C. 20005-1706
     Phone: (202) 339 8456
     Fax: (202) 339 8500
     Email:  jonathan.lopez@orrick.com
             wjacobson@orrick.com
             gsinger@orrick.com

     *Counsel for Defendant Vadim Mikerin*

28