## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

VADIM E. MIKERIN,

    Defendant.

Criminal Action No. TDC-14-0529

## MEMORANDUM OPINION

In October 2014, Defendant Vadim Mikerin ("Mikerin") was the President of TENAM, a company that serves as the official representative in the United States of JSC Techsnabexport ("TENEX"), a Russian company that, pursuant to an agreement between the United States and the Russian Federation, engaged in the sale and transfer of low-grade uranium originating from Russian nuclear warheads to companies in the United States for use in civilian nuclear reactors. On October 29, 2014, federal agents arrested Mikerin in his office building in Bethesda, Maryland. Mikerin has been charged in an indictment with conspiracy to interfere with interstate commerce by extortion, in violation of 18 U.S.C. § 1951(a) (2012), based on allegations that he was engaged in a three-year extortion conspiracy, during which he demanded "kickback" payments from United States companies in order to maintain contracts with TENEX.

Mikerin has filed a Motion to Suppress, ECF No. 46, in which he seeks to suppress all statements that he made to federal agents during an interview on October 29, 2014 immediately preceding his arrest, on the grounds that: (1) he made the statements while subject to a custodial interrogation, without first having received warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966); (2) his statements were made involuntarily, in violation of the Due Process Clause of the Fifth Amendment; and (3) his statements are inadmissible under Federal Rules of Evidence

402 and 403 as irrelevant or because their probative value is substantially outweighed by the risk of unfair prejudice. The Court has reviewed the briefs and held an evidentiary hearing on the Motion on April 17, 2015. For the following reasons, the Motion to Suppress is GRANTED IN PART and DENIED IN PART.

## FINDINGS OF FACT

The record in this case consists of (1) a video recording and transcript of the interview on October 29, 2014; (2) additional exhibits submitted by the parties; and (3) the testimony of Special Agent David Gadren ("SA Gadren") of the United States Department of Energy, Office of the Inspector General, which the Court finds to be credible. Based on this record, the Court makes the following findings of fact.

On October 29, 2014, SA Gadren and Special Agent Tim Taylor ("SA Taylor") of the Federal Bureau of Investigation ("FBI") conducted an interview of Mikerin about his activities as President of TENAM, pursuant to their ongoing investigation of a kickback scheme in which Mikerin and others were alleged to have extorted money from United States companies in exchange for contracts relating to the sale of low-grade uranium from Russia. Although the agents had previously secured an arrest warrant for Mikerin,[1] and had obtained a search warrant for the TENAM office, their plan was not necessarily to arrest Mikerin. The agents' goal was to secure Mikerin's voluntary cooperation with the investigation, which would include providing consent to search the TENAM office, responding to questions about the kickback scheme, and identifying other individuals involved in the scheme.

On the morning of the interview, the FBI arranged to have Mikerin receive a call at his office telling him that his car alarm had gone off. As Mikerin was returning from checking on

---

[1] The arrest warrant was recalled at the Government's request on August 15, 2014.

his car in the parking garage, SA Gadren approached Mikerin in the hallway outside the TENAM office, introduced himself, displayed his badge, and told Mikerin that "we had some questions and we were hoping that he would be able to help us by taking a look at some information." Test. SA David Gadren, Hearing on Motion to Suppress, *United States v. Mikerin*, No. 14-cr-0529-TDC, at 11:54:47 p.m. (D. Md. Apr. 17, 2015). SA Gadren was wearing a business suit and did not show, draw, or brandish his firearm, which was in his holster under his suit jacket, nor did he make any physical contact with Mikerin other than to shake his hand. Mikerin readily agreed to speak with SA Gadren. When Mikerin walked toward the entrance to the TENAM office, SA Gadren directed him to the vacant, private office suite adjacent to TENAM's office, where they met SA Taylor.

The agents led Mikerin into a conference room inside the office suite, where they had previously arranged an array of photographs, charts, and other documents on the walls and tables. These items included photographs of Mikerin and members of his family, documents collected during the investigation, a large flag of the former Soviet Union, and a "link analysis chart" that had a photograph of Mikerin with lines connecting him to other individuals who were potentially involved in the same activity under investigation.[2] The purpose of this display, in part, was to "intimidate" Mikerin in order to give him the impression that the agents "had full knowledge of his activities, both personal, professional, legitimate and illegitimate" so that "he had to be honest." *Id.* at 11:56:49; 12:24:28. When the agents directed Mikerin to a conference table, Mikerin chose the seat closest to the door. SA Taylor sat next to him, and SA Gadren sat at one end of the table.

---

[2] SA Gadren testified that some of these individuals had been definitively connected to Mikerin, while others were only the subject of investigative theories.

The interview began at approximately 10:20 a.m. and continued, with a one-hour break around noon, until approximately 3:00 p.m. Throughout the duration of the interview, the agents never raised their voices, and their tone was professional and non-threatening. Although both agents had service pistols in their holsters under their suit jackets, neither agent displayed, drew, or brandished his firearm at any point, and neither made any physical contact with Mikerin during the interview. While the discussion was ongoing, Mikerin was able to move around the room to view the photographs and documents posted on the wall. The agents offered Mikerin water and coffee on more than one occasion, which Mikerin accepted, as well as food, which Mikerin did not. Mikerin was never handcuffed or otherwise restrained at any time, and the door to the conference room remained open.

Mikerin received several cell phone calls and text messages during the interview. Although the agents requested that he not answer the first one, and suggested how to respond to inquiries about his present whereabouts, they never prevented him from answering calls or reviewing and sending text messages. At one point in the interview, both agents left the room so that Mikerin could make a phone call to cancel an afternoon meeting so that their interview could continue.

At multiple points during the discussion, the agents informed Mikerin that he did not have to speak with them, that he was not under arrest, and that he was free to leave at any time. Among these statements were:

> "Again, you don't have to tell us anything you don't want to tell us at this time. This is a situation. . . You came with me, voluntarily walked into the office, which I appreciate, and gave us the opportunity to share this with you."
> Oct. 29, 2014 Interview Tr. 7:11-15, Def.'s Hr'g Ex. A.

> "At this very moment you are not under arrest? Right? You're free to go. We told you that when you came in and sat down with us, you understood."
> *Id.* at 26:21-23.

"I know you're still thinking about what you want to do, which is fine. But, you know, I can't tell you what to do. I can't keep you here."
*Id*. at 30:5-7.

| | |
|---|---|
| SA Gadren: | "You're not under arrest right now." |
| Mikerin: | "Yes." |
| SA Gadren: | "You can leave right now." |
| Mikerin: | "Yes." |

*Id*. at 31:1-4.

In the first hour of the interview, the conversation generally consisted of efforts by the agents to persuade Mikerin to cooperate with their investigation. They informed him that they had uncovered violations of law, showed Mikerin documents and other information they had already gathered, and asked if he would agree to cooperate, including by sending his staff home and providing consent to a search of the TENAM office, for which the agents already had a search warrant, and by answering additional questions about the role of others involved in the alleged extortion scheme.

Among the considerations raised by the agents was that if Mikerin did not cooperate, the investigation would become public, including in Russia. When Mikerin described the consequences of such disclosure as likely to be "not lucky" and "not funny," Tr. 26:25-27:14, the agents offered assistance in helping Mikerin and his family stay in the United States. The agents discussed the general terms of Mikerin's potential cooperation, including how long it would take to answer the agents' questions about the scheme and the potential schedule for such discussions. As part of that discussion, when Mikerin asked if he was "free to go home tonight," SA Gadren told him, "Providing you cooperate with us, I'm more than happy to let you go home." Tr. 47:14-16. When Mikerin asked if he would be able to take an upcoming trip to New York that he had scheduled with his wife, SA Taylor said, "I think it would be very difficult . . . . But it's something we can certainly try to work with you on." Tr. 47:8-48:13.

At several points during the discussion, Mikerin referenced law or seeking advice, including stating:

> "I need someone to advise me with regards to the whole activities, initially arranged from your side. . . . . . But of course I definitely am not expert."
> Tr. 4:23-5:2.

> "I need to consult someone who would, just, maybe direct me . . . Because it's something which, of course, it was really surprised, surprised too much."
> Tr. 7:16-19.

> "What I am allowed to do right now in this certain circumstances? What are you not allowing me to do in this certain circumstances? I have to understand because . . . it's really surprised me. . . . . Because if it's some . . . again, I'm not legal, I am purely businessperson."
> Tr. 16:7-17.

> "Law is to call, advocate or whatever."
> Tr. 26:19.

Sometime around noon, Mikerin agreed to cooperate by accompanying the agents back to the TENAM office, sending his staff home, and consenting to a search of the TENAM office and computers. The agents and Mikerin then left the conference room and went next door to the TENAM office, where the agents, pretending to be building management personnel, told the staff that they needed to leave the building because it was undergoing pesticide treatment. For some period of time, Mikerin and SA Gadren were in Mikerin's personal office, where Mikerin sat at his desk and used his computer to check emails. At one point, Mikerin unlocked the door to the hallway restroom for SA Gadren to use, which Mikerin used as well.

After approximately one hour, Mikerin and the agents returned to the conference room, and the conversation continued. During this part of the interview, the agents asked various questions regarding the payments made by United States companies to Mikerin, including through offshore bank accounts. Mikerin acknowledged that he had received such payments, but maintained that the payments were "personal," "commission," and received as part of an

6

informal "gentleman agreement." *See, e.g.*, Tr. 70:15-72:9. He acknowledged that the term "cake" used in emails shown to him referred to these payments. Tr. 62:17-21. He maintained that the money was "private company . . . money" and not "government money." Tr. 66:2-4. He declined to identify any other individuals involved with the payment arrangements.

At approximately 2:00 p.m., one of the agents stepped out of the room to make a call to the prosecutor. The agents then informed Mikerin that the prosecutor was unsatisfied with the information and explanations that Mikerin had provided, and that they had been instructed to place Mikerin under arrest. Mikerin was not given *Miranda* warnings until approximately 2:35 p.m. He was then allowed to make a telephone call to his wife, which lasted until approximately 3:00 p.m. The Government does not contest that any statements Mikerin made after 2:00 p.m. and before he received *Miranda* warnings were made during a custodial interrogation and consents to the suppression of such statements.

## DISCUSSION

### I. Custodial Interrogation

Mikerin argues that all of the statements he made to the federal agents during the course of the interview should be suppressed because he was under custodial interrogation at the time and had not been read his *Miranda* rights. Upon consideration of the totality of the circumstances, the Court concludes that Mikerin was not in custody until the agents informed him at approximately 2:00 p.m. that they would be arresting him. Because Mikerin was not in custody, *Miranda* warnings were not required, and the statements he made to the agents prior to that point will not be suppressed.

The test for whether an individual is "in custody" such that *Miranda* warnings are required is whether, under the totality of the circumstances, the "suspect's freedom of action is

curtailed to a degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984); *United States v. Hargrove*, 625 F.3d 170, 178 (4th Cir. 2010). The analysis requires a court to determine, "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2402 (2011) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). Thus, the operative question is whether "a reasonable man in the suspect's position would have understood his position" as being "in custody." *Berkemer*, 468 U.S. at 442; *Hargrove*, 625 F.3d at 178. Because the test is an objective one, "the subjective views harbored by either the interrogating officers or the person being questioned are irrelevant." *United States v. Hashime*, 734 F.3d 278 (4th Cir. 2013). Among the factors to consider in the custodial inquiry are "the time, place, and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant." *Id.* at 283.

Here, there are numerous objective indicators that collectively establish that the interview of Mikerin was non-custodial. The encounter began with a request by SA Gadren, who was dressed in a business suit, that Mikerin meet with the agents, to which Mikerin voluntarily agreed. There were only two agents involved in the interview, and neither one ever drew or brandished his firearm or displayed it in a threatening manner. Neither agent made any physical contact with Mikerin, with the exception of shaking his hand. The agents' tone was at all times professional and non-threatening, and Mikerin was never handcuffed or physically restrained in any way. The door to the conference room remained open, Mikerin sat closest to the door, and he was permitted to move about the room to view the documents on the walls. The agents also

offered and provided Mikerin with water and coffee and allowed him to use the restroom. The agents did not prevent him from receiving cell phone calls and text messages. At one point, they went back to Mikerin's office together and allowed Mikerin to check email from his desk computer. Up until the point at which Mikerin was informed that he would be arrested, the encounter lasted approximately three hours and 40 minutes, with the formal interview portion lasting approximately two hours and 40 minutes in total.

These factors are consistent with those present in *United States v. Hargrove*, 625 F.3d 170 (4th Cir. 2010), and *United States v. Uzenski*, 545 F.3d 690 (4th Cir. 2006), in which the United States Court of Appeals for the Fourth Circuit found that there was no custodial interrogation. In *Hargrove*, the Fourth Circuit found that a two-hour interview of the defendant at his house was non-custodial even though it began with 10-15 agents going to his house to execute a search warrant, five of the agents entering to conduct a protective sweep, some with guns drawn, and agents conducting a pat down of the defendant. 625 F.3d at 173-74, 179. In finding that the defendant was not in custody, the court focused on the facts that the defendant was questioned by only two law enforcement agents who never drew or brandished their weapons, the agents never assumed a threatening tone, and they never handcuffed or physically restrained the defendant. *Id*. at 179-80.

In *Uzenski*, where the court found a two-hour and 45-minute interview at a law enforcement office to be non-custodial, the court also focused on the fact that the interviewing agents did not brandish weapons, that they did not speak in a threatening tone, that the defendant was not handcuffed or otherwise restrained, that the door was left partially open at times, and that the defendant was offered refreshments and allowed to leave the room to use the restroom. 545 F.3d at 704-05. In both of these cases, the Fourth Circuit emphasized that the defendants

were told that they were not under arrest and that they were free to leave. *Hargrove*, 625 F.3d at 179-80; *Uzenski*, 545 F.3d at 697, 704-05. Although such statements do not automatically establish that an interview was non-custodial, they are "highly probative" on the issue. *Hargrove*, 625 F.2d at 180.

Significantly, in this case, Mikerin was told on at least four occasions that he was not under arrest, was free to leave, or that he did not have to answer questions. At 10:28 a.m., he was told "Again, you don't have to tell us anything you don't want to tell us at this time." Tr. 7:11-12. At 11:05 a.m., he was told, "At this very moment you are not under arrest. Right? You're free to go. We told you that when you came in and sat down with us, you understood." Tr. 26:21-23. At 11:10 a.m., he was told, "I can't tell you what to do. I can't keep you here." Tr. 30:7. And at 11:12 a.m., he was told "You're not under arrest right now," and "You can leave right now," to which Mikerin responded, "Yes." Tr. 31:1-4.

Mikerin argues that this message was negated about ten minutes later, when Mikerin asked "Am I free to go home tonight or what?" and SA Gadren responded by stating, "Providing you cooperate with us, I'm more than happy to let you go home." Tr. 47:15-16. Having reviewed the complete recording and transcript of the interview, however, the Court finds that this statement was part of a broader discussion about when and for how long the agents would need to debrief Mikerin that day and over the next few days if he were to agree to cooperate, in which the agents indicated that under a cooperation arrangement, the "next few days may be a little . . . disrupted." Tr. 47:12. Thus, on balance, this exchange did not negate the overall, repeated message that Mikerin was not under arrest and was free to leave the interview at any time.

Indeed, toward the end of the interview, Mikerin made clear that he had not been forced to submit to the interview when he acknowledged that he had voluntarily chosen to speak with the agents to try to convince them that he had done nothing wrong. When the agents told him that the prosecutor was unsatisfied with the explanations that Mikerin had provided, Mikerin responded: "But that's the truth. That's why I came. . . . . I considered that you might believe and you still believe that I will create such a, like this chart, such interesting picture for you, which is absolutely not." Tr. 89:7-10. Thus, because the agents did not employ coercive measures and informed Mikerin that he was free to leave, the Court finds that the interview was non-custodial. *See Hargrove*, 625 F.3d at 179-80; *Uzenski*, 434 F.3d at 704-05.

Notably, these factors distinguish this case from those relied upon by Mikerin in which the Fourth Circuit found a custodial interrogation. In *United States v. Hashime*, 734 F.3d 278 (4th Cir. 2013), in which the Fourth Circuit found that a three-hour interview in the defendant's basement storage room was custodial, the court relied heavily on the "broader setting" of the encounter, which started when a team of 15-30 armed federal and state law enforcement agents descended upon the defendant's home equipped with a battering ram and "streamed into the house with their guns drawn," an officer woke the defendant with a gun pointed at him and ordered him to get up, and the officers ordered the defendant's family members outside, restricted their movements, and interrogated each of them individually. *Id.* at 280-81, 284. Likewise, in *United States v. Colonna*, 511 F.3d 431 (4th Cir. 2007), the Fourth Circuit found a custodial interrogation where the defendant was awakened in his home when law enforcement officers kicked open the defendant's bedroom door and ordered him at gunpoint to dress and come downstairs, the defendant's home was "inundated" by approximately 24 officers, the officers gave the defendant and his family members instructions and restricted their access to the

11

home, the defendant was questioned for three hours under guard inside an FBI vehicle, and he was never told that he was free to leave or that he did not have to respond to the agents' questions. *Id.* at 433, 435-36. Here, there was no such show of force at the outset or during the interview, and the agents informed Mikerin that he was free to leave.

Mikerin nevertheless asserts that a number of special circumstances rendered this interview custodial. First, Mikerin claims that the use of a ruse to arrange for Mikerin to be separated from his staff, the decision to conduct the interview in a conference room controlled by the agents, and the use of a display of photographs and evidence designed to "intimidate" Mikerin into believing there was a strong case against him, were so coercive as to render the interview custodial. Second, Mikerin asserts that the interview was custodial because the agents told him that the Department of Justice and multiple judges had found probable cause that his activities were criminal in nature, informed him that they already had a warrant to search his office, and in fact had previously secured an arrest warrant for Mikerin before the interview and were prepared to arrest him if he did not cooperate. These arguments fail because the Fourth Circuit has found such factors to be insufficient to render an interview custodial.

In *Uzenski*, the agents arranged to separate the defendant from a colleague and questioned him in a conference room at the state bureau of investigation office, *see Uzenski*, 545 F.3d at 696, a location even more explicitly under law enforcement control than the vacant office space in which Mikerin's interview took place. Like Mikerin, who was shown photographs and documents from the agents' investigation of his activities, the defendant in *Uzenski* was shown a highly incriminating video of himself purchasing bomb-making materials, and was told "We know who, we know what, we know where, and we know when. The only thing we don't know and want to know is why." *Id.* The defendant in *Uzenski* similarly was told that the agents

already had a search warrant for his premises, was asked if he would consent to the search, and was in fact arrested at the end of the encounter. *Id.* at 696-97. The Fourth Circuit held, however, that under the totality of the circumstances, including that the defendant was told he was free to leave, no force was used, and the agents' tone was non-threatening, that the interview was non-custodial. *Id.* at 704-05. Thus, under the totality of the circumstances in this case, the Court concludes that the Mikerin was not in custody until the agents informed him that they would be arresting him. Whether the agents were prepared to arrest Mikerin, or in fact arrested him at the end of the interview, does not change the analysis, because the custodial test is an objective one, where "the subjective views harbored by either the interrogating officers or the person being questioned are irrelevant." *Hashime*, 734 F.3d at 285 (citing *J.D.B.*, 131 S. Ct. at 2402).

Finally, Mikerin asserts that he effectively invoked his right to counsel multiple times during the interview, yet the agents continued with the interview. Although the right to counsel only attaches when an individual is taken into custody or formally charged, *Davis v. United States*, 512 U.S. 452, 456-57 (1994), Mikerin asserts that his invocation of the right to counsel would render the interview custodial, his statements involuntary, or both. A review of the recording, however, reveals that Mikerin never invoked his right to counsel. The Supreme Court held in *Davis* that invocation of the right to counsel must be "unambiguous," and that an "ambiguous or equivocal" reference to counsel, such that a "reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," is not enough to constitute an assertion of the right to counsel that would require an interview to be stopped. *Id.* at 459. Such insufficient statements include: "Maybe I should talk to a lawyer," *id.* at 462; "I think I need a lawyer," *Burket v. Angelone*, 208 F.3d 172, 198 (4th Cir. 2000); and "Do you think I need an attorney here?" *Mueller v. Angelone*, 181 F.3d 557, 573-

74 (4th Cir. 1999). Here, all of Mikerin's statements referencing "law" or "advice" are significantly more ambiguous and equivocal than these statements. The closest references to legal counsel were: "I need someone to advise me with regards to the whole activities, initially arranged from your side. . . . . Because I definitely am not expert," Tr. 4:23-5:2, and "Law is to call, advocate or whatever." These statements do not come close even to those statements that the Supreme Court and the Fourth Circuit have found to be insufficient, and therefore were not invocations of the right to counsel. Thus, to the extent that such statements could factor into the analysis of whether Mikerin was in custody in the first place, they do not establish a custodial interrogation.[3]

For all of these reasons, the Court finds that Mikerin was not subjected to a custodial interrogation until he was informed at approximately 2:00 p.m. that he would be arrested, and denies the Motion to Suppress as to statements made before he was so informed. From that point forward, however, Mikerin was in custody, so any statements made between that time and when he was administered *Miranda* warnings at approximately 2:35 p.m. are suppressed.

## II. Voluntariness

Mikerin also argues that regardless of whether the interview was custodial, the statements he made to the agents must be suppressed because they were made involuntarily, in violation of the Fifth Amendment's Due Process Clause. To determine whether a statement was involuntary, the inquiry is whether the subject's will has been overborne" or his "capacity for self-

---

[3] For the same reasons, the Court concludes that such statements do not render Mikerin's statements involuntary. *See United States v. Pelton*, 835 F.2d 1067, 1072 (4th Cir. 1987) (finding that when an agent told the defendant about a hypothetical individual who had committed acts that the defendant had committed, the defendant's statement that the hypothetical individual would be "'crazy' not to talk to a lawyer," followed by the agent telling him that there is a right to counsel but that "options would be reduced" if an outsider were brought into the discussion, did not render statements made during the interview involuntary).

determination critically impaired." *United States v. Pelton*, 835 F.2d 1067, 1071-72 (4th Cir. 1987). In determining voluntariness, the court examines "the totality of the circumstances," including the defendant's individual characteristics and background, the setting in which the statements were made, and the details of the interrogation or interview. *Id.* To be voluntary, the interrogation or interview need not be free from intimidation. *Id.*; *United States v. Braxton*, 112 F.3d 777, 780-82 (4th Cir. 1997) (*en banc*). For example, "[t]ruthful statements about [the defendant's] predicament are not the type of coercion that threatens to render a statement involuntary." *Id.* at 782 (internal quotation marks omitted).

Mikerin asserts that his statements were involuntary because he is a Russian national who speaks limited English and grew up in the former Soviet Union, and so lacked experience with the protections of the United States legal system. He also claims that he was coerced to make statements by "thinly-veiled threats of violence" and "implied promises" that "exploited his affection for his family." Mot. Suppress at 19. First, the evidence does not support the characterization of Mikerin as an unsophisticated foreign national, who did not speak English well enough to understand the encounter, and whose personal history rendered him inherently intimidated by an encounter with law enforcement. To the contrary, Mikerin is the president of a company who negotiates business deals worth hundreds of millions of dollars in English. When the agents offered Mikerin a translator, he acknowledged the offer, but did not accept it. Moreover, Mikerin's statements during the interview indicated that, far from being intimidated by the agents, he actually sought to negotiate with them. Mikerin told the agents, "I don't want to promise or reject any proposal . . . accept or reject it. To consider everything because I am quite experienced in this life, so . . . ." Tr. at 25:13-17.

Second, the agents did not overcome Mikerin's will through threats or promises. The agents did indicate that if Mikerin cooperated, his family and his Russian business associates would not need to know, but that if he did not cooperate, the allegations against him would be made public. However, in *Pelton*, the Fourth Circuit found that similar statements by FBI agents, that they would conduct a "full scale investigation" if the suspect did not cooperate, but that "if he cooperated there would be no overt investigation," did not constitutes threats or promises that would render statements involuntary. 835 F.2d at 1072-73.   A review of the recording establishes that the agents never threatened Mikerin or his family.  The agents did suggest on more than one occasion that Mikerin might have concerns about how individuals in Russia would react to news that he had been receiving payments, and Mikerin responded that the consequences in Russia would be "not lucky" and "not funny," Tr. 27:10-14, but when the agents offered to help him to stay in the United States and protect his family if he agreed to cooperate, Mikerin did not indicate that he actually believed that parties in Russia would physically harm him, and he did not express any interest in the offer of protecting him and his family.

Although Mikerin also suggests that he may have felt coerced when the agents said that they "needed" Mikerin to speak with them, a review of the recording reveals that such statements were not threats in either content or tone.  Indeed, in *Braxton*, the Fourth Circuit rejected a defendant's argument that his statements were involuntary because the agents had approached him by saying that they "needed" to ask him some questions, then made statements during the questioning that the defendant was "not coming clean" and that the defendant "could get five years" because he was not coming clean.  112 F.3d at 781-83.  To the extent that the agents here told Mikerin that he needed to say more, they did so in the context of informing him that if his intention was to cooperate with the agents, he would need to provide more information.

Most significant to the involuntariness inquiry is the manner in which Mikerin answered questions. Mikerin did not bend to the will of the agents. Rather, he consistently refused to identify other individuals involved in the payment arrangements, firmly held to his position that his activities were private business activities that were not unlawful, and maintained an overall tone that did not, as Mikerin claims, indicate that he was "highly agitated" or intimidated by the agents. Mot. Suppress at 22. In fact, toward the end of the interview, Mikerin indicated that he was not impressed with the agents' investigation and display of evidence: "I was surprising that it took you a lot of efforts, time to get everything. It's definitely not for you, it's probably for me right? Or you invited me for what? To see these nice pictures? For what? . . . . I appreciate the joke." Tr. 86:23-25; 87:3. Finally, as discussed above, *see supra* part I, Mikerin acknowledged at the end of the interview that he had voluntarily agreed to the interview because he considered that the agents would believe his explanations. *See* Tr. 89:7-11 ("But that's the truth. That's why I came. . . . . I considered that you might believe and you still believe that I will create such a, like this chart, such interesting picture for you, which is absolutely not."). Thus, under the totality of the circumstances, the evidence does not support the view that Mikerin's will was overborne or his capacity for self-determination critically impaired. As in *Pelton*, Mikerin appears to have "made a calculated decision in talking and attempting to bargain with the agents," and now "realizes that his expectations did not pan out." 835 F.2d at 1074. The Court therefore concludes that Mikerin's statements were voluntarily made.

## III. Admissibility under the Federal Rules of Evidence

Mikerin further argues that, to the extent that Mikerin's statements are not suppressed based on constitutional violations, the Court should exclude them because of their slight probative value, and because any such value is outweighed by the risk of unfair prejudice. Under

Federal Rule of Evidence 402, evidence must be relevant to be admissible. Evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence" and the "fact is of consequence in determining the action." Fed. R. Evid. 401. The court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403.

Mikerin argues that his statements are not relevant because they relate to transactions and entities outside of the pending indictment, and that any statements relating to the charged conduct should be excluded under Rule 403 because Mikerin's English proficiency was so limited that his responses were "nonsensical and confused." Mot. Suppress at 24. Having reviewed the recording and transcript, the Court declines to exclude the statements on a wholesale basis. The recording indicates that Mikerin understands and speaks English well enough that his statements were generally responsive to the questions and comprehensible to the listener, and that he made a number of statements that appear to be relevant to the charged conduct and admissible under Rules 402 and 403. To the extent that certain statements made during the interview relate to uncharged conduct, or are sufficiently confusing to warrant exclusion under Rule 403, decisions on admissibility should be made closer to trial through a process by which (1) the Government specifically identifies the parts of the interview it seeks to offer as evidence; and (2) Mikerin has the opportunity to file a motion *in limine* to exclude specific statements it believes to be inadmissible under Rule 402 or 403.

## CONCLUSION

The Court finds that (1) Mikerin was not in custody until the agents informed him that they would be arresting him, and (2) his statements were voluntarily made. Thus, the Motion to Suppress is DENIED as to any statements made during the interview before Mikerin was informed he would be arrested. The Motion is GRANTED as to any statements made after Mikerin was told that he would be arrested and before he was administered *Miranda* warnings (from approximately 2:00 p.m. to 2:35 p.m.). The Motion to Exclude under Federal Rules of Evidence 402 and 403 is DENIED without prejudice. A separate Order follows.

Date: May 7, 2015

THEODORE D. CHUANG
United States District Judge