FILED ___ ENTERED
LOGGED ___ RECEIVED

AUG 27 2015

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

DIS/MTP: USAO2013R00809

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. TDC-14-0529 |
| | * | |
| VADIM MIKERIN, | * | (Conspiracy to Commit Money |
| | * | Laundering, 18 U.S.C. § 371; Forfeiture, |
| Defendant | * | 18 U.S.C. § 982(a)(1) and 28 U.S.C. |
| | * | § 2461(c)) |
| | * | |

*******

## SUPERSEDING INFORMATION

### COUNT ONE

The United States charges:

### Introduction

At all times material to this Superseding Information:

1. At all relevant times prior to 2007, JSC Techsnabexport ("TENEX") was a wholly owned subsidiary of Rosimushchestvo, the Russian Federation's agency responsible for state property management.

2. At all relevant times beginning in 2007, TENEX was a wholly owned subsidiary of JSC Atomenergoprom, which in turn, was a wholly owned subsidiary of The State Atomic Energy Corporation ROSATOM ("ROSATOM"). TENEX operated as the sole supplier and exporter of Russian Federation uranium and uranium enrichment services to nuclear power companies worldwide. In or about October 2010, TENEX established TENAM Corporation ("TENAM") as its wholly owned subsidiary and official representative in the United States. Under the laws of the United States, TENEX and TENAM were each an "agency" and "instrumentality" of a foreign government, as those terms are used in the Foreign Corrupt Practices Act ("FCPA"), Title 15,

United States Code, Sections 78dd-1(f)(1) and 78dd-2(h)(2).

3.      Transportation Corporation A was a United States company, headquartered in Maryland, which provided logistical support services for the transportation of nuclear materials to customers in the United States and to foreign customers, including TENEX. Transportation Corporation A was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(B).

4.      Cylinder Corporation One was a United States company, headquartered in Ohio, which manufactured tanks and vessels for the oil and gas, nuclear, and marine markets. Cylinder Corporation One contracted with TENEX to supply storage and transportation cylinders. In or about September 2012, Cylinder Corporation One was acquired by another company headquartered in Ohio ("Parent Corporation A"). At all relevant times, Cylinder Corporation One was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(B). Parent Corporation A was an "issuer," as that term is used in the FCPA, Title 15 United States Code, Section 78dd-1.

5.      Co-Conspirator 1 was a citizen of the United States and a resident of Maryland. Co-Conspirator 1 was an owner and executive of Transportation Corporation A from in or about 1998 through in or about December 2009. Co-Conspirator 1 owned and controlled "Consulting Corporation One," which was based in Maryland. Co-Conspirator 1, through Consulting Corporation One, acted as a consultant to Transportation Corporation A from in or about January 2010 through his death in August 2011, and as a consultant to Cylinder Corporation One from in or about August 2010 through his death in August 2011. Co-Conspirator 1 was a "domestic concern," and an officer, employee and agent of a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

6. Co-Conspirator 2 was a citizen of the United States and resident of Maryland. Co-Conspirator 2 was an owner and executive of Transportation Corporation A from in or about August 1998 through in or about October 2014. Co-Conspirator 2 was the co-President of Transportation Corporation A from in or about January 2010 through in or about October 2014. At all relevant times, Co-Conspirator 2 was a "domestic concern" and an officer, employee and agent of a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

7. Co-Conspirator 3 was a citizen of the United States and resident of New Jersey, and was the owner and sole employee of Consulting Corporation Two, which was based in New Jersey. At all relevant times, Co-Conspirator 3 was a "domestic concern" and an officer, employee and agent of a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

8. Executive A was a citizen of the United States, and was an officer of Cylinder Corporation One.

9. Executive B was a citizen of the United States, and was an employee of Transportation Corporation A.

10. The defendant, **VADIM MIKERIN** ("**MIKERIN**"), was a national of the Russian Federation. Defendant **MIKERIN** was a Director of the Pan American Department of TENEX from at least in or about 2004 through in or about 2010, and was the President of TENAM from in or about October 2010 through in or about October 2014. From in or about December 2011 through in or about October 2014, defendant **MIKERIN** was a resident of Maryland. Defendant **MIKERIN** was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1) and 78dd-2(h)(2).

3

## The Conspiracy

11. Beginning in or about 2004 and continuing through in or about October 2014, in the District of Maryland and elsewhere, the defendant,

**VADIM MIKERIN,**

did knowingly and willfully conspire with Co-Conspirator 1, Co-Conspirator 2, Co-Conspirator 3, and others known and unknown, to transport, transmit, and transfer monetary instruments and funds from a place in the United States to a place outside the United States with the intent to promote the carrying on of specified unlawful activities, namely, violations of the FCPA, Title 15, United States Code, Sections 78dd-1 and 78dd-2, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

## Manner and Means of the Conspiracy

The manner and means by which defendant **MIKERIN** and his co-conspirators sought to accomplish the object of the conspiracy included, among other things, the following:

12. It was part of the conspiracy that beginning in or about 2004 through in or about October 2014 defendant **MIKERIN**, Co-Conspirator 1, Co-Conspirator 2, and others caused payments totaling approximately $1,818,462.36 to be made from Transportation Corporation A's bank account in Maryland into shell company bank accounts in Latvia, Cyprus, and Switzerland with the intent to promote the carrying on of violations of the FCPA.

13. It was further part of the conspiracy that beginning in or about 2011 through in or about 2013 defendant **MIKERIN**, Co-Conspirator 1, Co-Conspirator 3, and others caused payments from Cylinder Corporation A and Parent Corporation A to be made through intermediary company bank accounts in the United States into shell company bank accounts in Latvia and Switzerland, totaling approximately $308,160, with the intent to promote the carrying

4

on of violations of the FCPA.

14. It was further part of the conspiracy that defendant **MIKERIN** and others discussed making the payments to the shell company accounts in person, and through electronic mail ("email"), among other means.

15. It was further part of the conspiracy that defendant **MIKERIN** and others sent email communications and used other forms of communication in which they used terms like "lucky figure," "LF," "cake," and "remuneration" as code words to conceal the true nature of the payments.

### Overt Acts

16. In furtherance of the conspiracy, and to achieve the objects thereof, at least one of the conspirators committed, and caused to be committed, in the District of Maryland and elsewhere, at least one of the following overt acts, among others:

    a. On or about March 23, 2011, Cylinder Corporation One made a $97,500 payment to Co-Conspirator 1, through Consulting Corporation One.

    b. On or about March 28, 2011, Co-Conspirator 1 wired $85,800 from Consulting Corporation One's bank account located in the United States into a shell company bank account located in Latvia, based on information as to location and timing provided by defendant **MIKERIN**.

    c. On or about March 27, 2012, defendant **MIKERIN** sent an email to Co-Conspirator 2 and Executive B stating in relevant part: "a channel for 'lucky figures' process has been checked and confirmed (no changes), so you will get an invoice for the amount 48,089.30 tomorrow. Would you please to confirm that it'll be done before the end of the month of Q1 or early next week."

      d.      On or about March 29, 2012, Transportation Corporation A made a wire transfer in the amount of $48,089.30 from Transportation Corporation A's bank account in Maryland into a shell company bank account in Latvia.

      e.      On or about November 20, 2012, Co-Conspirator 3 deposited a $91,500 payment from Cylinder Corporation One's bank account into Consulting Corporation Two's bank account located in the United States.

      f.      On or about December 7, 2012, Co-Conspirator 3 wired $60,000 from Consulting Corporation Two's bank account located in the United States into a shell company bank account located in Latvia, based on information as to location and timing provided by defendant **MIKERIN**.

      g.      On or about August 29, 2013, defendant **MIKERIN** sent an email to Executive A stating in relevant part: "just wanted to kindly ask you to synch with [Co-Conspirator 2] in order to settle our 30,9k matter asap. They know the ropes and all we need is to proceed and get a final result."

      h.      On or about November 29, 2013, Parent Corporation A issued a check in the amount of $30,900 that was deposited into Transportation Corporation A's bank account in Maryland.

      i.      On or about December 16, 2013, Transportation Corporation A sent a wire transfer from its bank account in Maryland into a shell company bank account in

Switzerland, which included Parent Corporation A's payment, minus a fee, in addition to a payment made by Transportation Corporation A.

18 U.S.C. § 371

## FORFEITURE ALLEGATION

The United States further finds that:

1. Pursuant to Fed. R. Crim. P. 32.2, notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C. § 982(a)(1), 21 U.S.C. § 853, and 28 U.S.C. § 2461(c), upon the defendant's conviction on Count of this Information.

2. As a result of the offense alleged in Count One of this Information, the defendant,

**VADIM MIKERIN,**

shall forfeit to the United States of America, pursuant to 18 U.S.C. § 982(a)(1), any property, real and personal, involved in such offenses, and any property traceable to such property. The property to be forfeited includes, but is not limited to, a money judgment in the amount of $2,126,622.36 and all interest and proceeds traceable thereto, in that such sum in aggregate constitutes proceeds obtained, directly or indirectly, as a result of such violation.

### Substitute Assets

3. If the property described above in paragraph 2, as being subject to forfeiture, as a result of any act or omission of the defendant

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third person;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or,

    e. has been commingled with other property which cannot be subdivided without difficulty;

the United States shall be entitled to forfeiture of substitute property pursuant to Title 21, United

States Code, Section 853(p), up to the value of the forfeitable property, that is, $2,126,622.36.

18 U.S.C. § 982(a)(1)
28 U.S.C. § 2461(c)

_____        _____
ANDREW WEISSMANN                                    ROD J. ROSENSTEIN
Chief, Fraud Section                                        United States Attorney
Criminal Division                                             District of Maryland
Department of Justice

Aug. 26, 2015
Date

9