**ATTACHMENT A:**
**STIPULATED FACTS – UNITED STATES v. VADIM MIKERIN**

*If this matter had proceeded to trial, the government would have proven the following facts beyond a reasonable doubt. The parties agree that the following facts do not encompass all of the facts that would have been proven had this matter proceeded to trial.*

**VADIM MIKERIN ("MIKERIN"),** a national of the Russian Federation, was a Director of the Pan American Department of JSC Techsnabexport ("TENEX") from at least in or about 2004 through in or about 2010, and was the President of TENAM Corporation ("TENAM") from in or about October 2010 through in or about October 2014. From in or about December 2011 through in or about October 2014, **MIKERIN** was a resident of Maryland.

At all relevant times prior to 2007, TENEX was a wholly owned subsidiary of Rosimushchestvo, the Russian Federation's agency responsible for state property management. At all relevant times beginning in 2007, TENEX was a wholly owned subsidiary of JSC Atomenergoprom, which, in turn, was a wholly owned subsidiary of The State Atomic Energy Corporation ROSATOM ("ROSATOM"). TENEX operated as the sole supplier and exporter of Russian Federation uranium and uranium enrichment services to nuclear power companies worldwide. In or about October 2010, TENEX established TENAM as its wholly owned subsidiary and official representative in the United States. Under the laws of the United States, TENEX and TENAM were each an "agency" and "instrumentality" of a foreign government, as those terms are used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Sections 78dd-1(f)(1) and 78dd-2(h)(2). Thus, at all relevant times, **MIKERIN** was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1) and 78dd-2(h)(2).

"Transportation Corporation A" was a United States company, headquartered in Maryland, which provided logistical support services for the transportation of nuclear materials to customers in the United States and to foreign customers, including TENEX. At all relevant times, Transportation Corporation A was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(B).

"Cylinder Corporation One" was a United States company, headquartered in Ohio, which manufactured tanks and vessels for the oil and gas, nuclear, and marine markets. Cylinder Corporation One contracted with TENEX to supply storage and transportation cylinders. In or about September 2012, Cylinder Corporation One was acquired by another company headquartered in Ohio ("Parent Corporation A"). At all relevant times, Cylinder Corporation One was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(B). At all relevant times, Parent Corporation A was an "issuer," as that term is used in the FCPA, Title 15 United States Code, Section 78dd-1.

"Co-Conspirator 1" was a citizen of the United States and a resident of Maryland. Co-Conspirator 1 was an owner and executive of Transportation Corporation A from in or about 1998 through in or about December 2009. Co-Conspirator 1 owned and controlled "Consulting Corporation One," which was based in Maryland. Co-Conspirator 1, through Consulting

Corporation One, acted as a consultant to Transportation Corporation A from in or about January 2010 through his death in August 2011, and as a consultant to Cylinder Corporation One from in or about August 2010 through his death in August 2011. Thus, at all relevant times, Co-Conspirator 1 was a "domestic concern," and an officer, employee and agent of a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

"Co-Conspirator 2" was a citizen of the United States and resident of Maryland. Co-Conspirator 2 was an owner and executive of Transportation Corporation A from in or about August 1998 through in or about October 2014. Co-Conspirator 2 was the co-President of Transportation Corporation A from in or about January 2010 through in or about October 2014. Thus, at all relevant times, Co-Conspirator 2 was a "domestic concern" and an officer, employee and agent of a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

"Co-Conspirator 3" was a citizen of the United States and resident of New Jersey, and was the owner and sole employee of "Consulting Corporation Two," which was based in New Jersey. Thus, at all relevant times, Co-Conspirator 3 was a "domestic concern" and an officer, employee and agent of a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

"Executive A" was a citizen of the United States, and was an officer of Cylinder Corporation One.

"Executive B" was a citizen of the United States, and was an employee of Transportation Corporation A.

Between at least in or about 2004 and in or about October 2014, in the District of Maryland and elsewhere, Co-Conspirator 1, Co-Conspirator 2, and others, knowingly, willfully, and corruptly conspired to violate the FCPA, and did violate the FCPA, in violation of 15 U.S.C. §§ 78dd-1 and 78dd-2. Specifically, Co-Conspirator 1, Co-Conspirator 2, and others knowingly, willfully, and corruptly agreed to make payments, and caused Transportation Corporation A to make payments, for the future benefit of **MIKERIN** and, before his death, Co-Conspirator 1, in order to influence **MIKERIN** and to secure an improper business advantage for Transportation Corporation A; and Co-Conspirator 1 and others knowingly, willfully, and corruptly agreed to make payments, and caused Cylinder Corporation One and Parent Corporation A to make payments, for the future benefit of **MIKERIN** and, before his death, Co-Conspirator 1, in order to influence **MIKERIN** and to secure an improper business advantage for Cylinder Corporation One (the "FCPA Violations"). According to **MIKERIN**, the payments were to be used for future business purposes.

Between in or around 2004 through in or around October 2014, in the District of Maryland and elsewhere, **MIKERIN** knowingly conspired with others to commit offenses against the United States, namely to commit international promotion money laundering, in violation of 18 U.S.C. §§ 1956(a)(2)(A), all in violation of 18 U.S.C. § 371. Specifically, beginning in or about 2004 and continuing through in or about October 2014, in the District of Maryland and elsewhere, **MIKERIN** did willfully and knowingly conspire with others,

including Co-Conspirator 1, Co-Conspirator 2, and Co-Conspirator 3, and others to transport, transmit, and transfer monetary instruments and funds from a place in the United States to a place outside the United States with the intent to promote the carrying on of specified unlawful activity, to wit, the FCPA Violations, in violation of 15 U.S.C. §§ 78dd-1 and 78dd-2 ("the money laundering conspiracy").

In furtherance of the underlying FCPA violations, Co-Conspirator 1, Co-Conspirator 2, and others caused Transportation Corporation A and Cylinder Corporation One to enter into contracts with TENEX, and TENEX deposited payments under the contracts into the bank accounts of Transportation Corporation A and Cylinder Corporation One.

In furtherance of the money laundering conspiracy, **MIKERIN** and his co-conspirators caused wire payments to be made from bank accounts located in the United States into shell company bank accounts located in Latvia, Cyprus, and Switzerland, used the code words "lucky figure," "LF," "cake," and "remuneration" to describe the payments, and communicated in person and via electronic mail ("email") about the payments. For example:

- **MIKERIN**, Co-Conspirator 1, Co-Conspirator 2, and others caused Transportation Corporation A to make payments from a bank account in Maryland into shell company bank accounts in Latvia, Cyprus, and Switzerland. Concerning one such transaction, on or about March 27, 2012, **MIKERIN** sent an email to Co-Conspirator 2 and Executive B stating in relevant part: "a channel for 'lucky figures' process has been checked and confirmed (no changes), so you will get an invoice for the amount 48,089.30 tomorrow. Would you please to confirm that it'll be done before the end of the month of Q1 or early next week." On or about March 29, 2012, Transportation Corporation A made a wire transfer in the amount of $48,089.30 from Transportation Corporation A's bank account located in Maryland into a shell company bank account located in Latvia.

- With **MIKERIN**'s assistance, Co-Conspirator 3 entered into consulting agreements with both Cylinder Corporation One and a shell company. Through these consulting agreements Co-Conspirator 3 received payments from Cylinder Corporation One and then passed the payment to an offshore bank account based on information as to location and timing that **MIKERIN** provided. Concerning one such transaction, on or about November 20, 2012, Co-Conspirator 3 deposited a $91,500 payment from Cylinder Corporation One's bank account into Consulting Corporation Two's bank account located in the United States. On or about December 7, 2012, Co-Conspirator 3 wired $60,000 from Consulting Corporation Two's bank account located in the United States into a shell company bank account located in Latvia, based on information as to location and timing that **MIKERIN** provided.

- **MIKERIN**, Co-conspirator 1, and others caused Consulting Corporation One to make payments into a shell company bank account located in Latvia. Concerning one such transaction, on or about March 23, 2011, Co-Conspirator 1 received a $97,500 payment from Cylinder Corporation One. On or about March 28, 2011, Co-Conspirator 1 wired $85,800 from Consulting Corporation One's bank account

located in the United States into a shell company bank account located in Latvia, based on information as to location and timing that **MIKERIN** provided.

- On or about August 29, 2013, **MIKERIN** sent an email to Executive A that stated in relevant part: "just wanted to kindly ask you to synch with [Co-Conspirator 2] in order to settle our 30,9k matter asap. They know the ropes and all we need is to proceed and get a final result." Thereafter, Parent Corporation A issued a check in the amount of $30,900 that was deposited into Transportation Corporation A's bank account located in Maryland. Weeks later Transportation Corporation A sent a wire transfer from its bank account located in Maryland into a shell company bank account located in Switzerland, which included Parent Corporation A's payment, minus a fee, in addition to a payment Transportation Corporation A made, all based on information as to location and timing that **MIKERIN** provided.

From in or about 2004 through in or about October 2014, **MIKERIN** did willfully and knowingly conspire with Co-Conspirator 1, Co-Conspirator 2, Co-Conspirator 3, and others to transport, transmit, and transfer approximately $2,126,622.36 from the United States to places outside the United States with the intent to promote the carrying on of the FCPA Violations.

I have read this statement of Stipulated Facts and carefully reviewed it with my attorneys. I acknowledge that it is true and correct.

_August 25, 2015_
Date

_8/25/2015_
Date

Vadim Mikerin

William B. Jacobson, Esq.
Jonathan E. Lopez, Esq.

13